The MIDLAND BANK AND TRUST COMPANY, Plaintiff,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant.

Civ. A. No. 986–70.

United States District Court, D. New Jersey.

Sept. 29, 1977.

Riker, Danzig, Scherer & Brown, by Alvin Weiss, Newark, N. J., for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, by Paul F. Newlon, Robert S. Smith, Jonathan H. Sinnreich, New York City, for plaintiff (N.Y. Counsel).

Elmer W. Beasley, Hartford, Conn., for defendant (Conn. Counsel).

Stickel, Kain & Stickel, by David G. Crocco, Newark, N. J., for defendant.

WHIPPLE, Chief Judge.

This is a civil action brought by the plaintiff, The Midland Bank and Trust Company (Midland) seeking indemnity under a bankers blanket employee fidelity bond and an excess bank employee dishonesty bond issued to the plaintiff by the defendant, Fidelity and Deposit Company of Maryland (F & D). Although originally instituted in state court, this diversity action was removed to this Court, the jurisdiction of this Court being premised upon 28 U.S.C. § 1332. The cause was tried to the Court without a jury and the following constitutes this Court's findings of fact and conclusions of law.

Effective August 19, 1968, F & D issued to Midland its Standard Form # 24 Bankers Blanket Bond providing primary coverage in the amount of $750,000 and standard form # 28 providing the Bank with excess coverage of $1,000,000. The bonds, which contain virtually identical provisions, seek to indemnify the Bank against any loss sustained through any "dishonest, fraudulent or criminal act"[1] of an "Employee",[2] "sustained . . . at any time but discovered . . . prior to the termination . . . of this bond."

The Bank, which lost a considerable sum of money through a series of transactions which will collectively be referred to as the "ship loans", contends such loss was suffered as a result of the dishonest, fraudulent and/or criminal acts of two of its former employees, John Pensec and Peter Moraites, and the Bank therefore is entitled to recover under the bonds.

The defendant, in addition to contending that the Bank has failed to establish the existence of even a single dishonest act, within the meaning of the bonds, argues (1) that Moraites was never an "Employee" of the Bank and (2) assuming arguendo, that the plaintiff has sustained a loss through dishonest and fraudulent acts, the Bank failed to comply with the notice provisions of the bonds, thus releasing the defendant from liability thereunder.

It is undisputed that John Pensec was an "Employee" of the Bank within the meaning of the bonds. Pensec joined Midland sometime in 1962 as an assistant vice president. Two years later, on October 19, 1964, he was named as a director of the Bank and was also appointed as vice president, chief administrative officer, secretary of the Board of Directors and made a member of the executive committee. On May 16, 1966 Pensec became president of the Bank, which position he held until his resignation on May 7, 1969.

Peter Moraites was a member of Midland's Board of Directors from the time of the Bank's inception in 1957 until April 30, 1969 when he resigned from the Board. During this time Moraites, an attorney, was a partner in the New York based law firm of Hill, Betts, Yamaoka, Freehill and Longcope, which firm specialized in admiralty law and maritime financing. Presumably because of his background in the field of maritime financing, it was Moraites who first suggested in 1962 that Midland involve itself in the making of ship loans. The Board, accepting Moraites' suggestion, considered these loans a good investment because they generally command a higher

---

1. Specifically under "Losses Covered by This Bond" Bond No. 53 60 496D, (Standard Form No. 24) provides: (A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of property through any such act of any of the Employees.

2. Again, the two bonds basically define "Employee" in the same manner. Standard Form No. 24 defines the term as follows:

Wherever used in this bond, Employee and Employees shall be deemed to mean, respectively, one or more of the Insured's officers, clerks and other employees while employed in, at or by any of the Insured's offices while covered under this bond, and attorneys, retained by the Insured to perform legal services for the Insured and the employees of such attorneys while such attorneys or the employees of such attorneys are performing such services for the Insured, and Guest Students pursuing their studies or duties in any of said offices.

rate of interest than any other commercial loan. Initially, Midland's involvement in making ship loans was minimal, limiting itself to what are known as "participation loans." In a participation loan there is always a lead bank, which puts up the major portion of the loan and further handles all of the documentation. Midland's role in these transactions consisted solely of contributing its share of the money.

In 1965, however, Moraites suggested to the Board of Directors that Midland begin to make direct loans to foreign ship companies, independently of other participating banks. Specifically, Moraites recommended the Bank involve itself with three separate categories of ship loans. These three types of loans included: (1) ship mortgage loans which would be secured by taking first mortgage liens on the ships; (2) charter party loans secured by assignments of the charter hire which meant that no cargo could be unloaded before the Bank was paid; and (3) letters of credit which were to be secured by cash on deposit in the Bank equal to the full amount of the letter of credit. The Board, upon accepting Moraites' proposal, initially set a lending limit of $500,000 on each of the three ship loan categories and, further, through an informal agreement, gave both Moraites and Pensec blanket authority to make loans without prior Board approval. The Board, thus, placed its reliance upon both Pensec and Moraites to administer these loans efficiently.

Every ship loan which came into the Bank was introduced by Moraites and placed on the books at the specific direction of Pensec, virtually each time without either the prior approval or authorization of the Board of Directors or the executive committee.

In addition to bringing every ship loan to the Bank, it was understood by all that it would be Moraites' responsibility to see that all the necessary documentation in connection with the loans was properly prepared. It is clear that Midland looked solely to Moraites and his law firm as the counsel for the Bank in connection with the ship loans.[3]

Although the Board was under the impression that no ship loan would be booked unless it complied with the requirements for the three types of loans set forth above, this clearly was not the case. Almost immediately Pensec and Moraites ignored the lending limits established by the Board and further booked loans which did not satisfy the Bank's requirements for collateral. In fact, in most instances, no collateral whatsoever was obtained at the time the note was put on the books. Despite this absence of collateral, Pensec instructed the tellers to credit the loan proceeds to the borrowers. When advised by a teller that the collateral Pensec had stated would be obtained was not forthcoming, he on several occasions instructed the teller to contact Moraites, who would often have some type of security instrument delivered to the Bank by a courier from his office.

Even when collateral was obtained initially from the borrowers, it was generally grossly inadequate. Although authorized to issue ship mortgage loans only when receiving first mortgage liens on the ships, Pensec and Moraites often granted loans when obtaining, for example, only second mortgage liens, or the personal guarantees of stockholders. As it was Moraites' duty to obtain any required security instruments and insure they were properly executed, he clearly had to be aware of the fact that anything less than a first mortgage lien would not satisfy the requirements established by the Board and further might increase the likeli-

3. In a letter to Midland from Hill, Betts dated February 3, 1967 the law firm acknowledged its attorney client relationship with the Bank when John F. Long, writing for the firm, stated:

It will give us pleasure to continue to represent you in connection with loans secured by ship mortgages and assignment of charter hire and related matters and to continue to prepare all necessary documentation and attend to their recording and filing as required to render them enforceable under applicable laws. We shall render legal opinions in each transaction for your guidance and protection. If we can be of any further assistance to you, please feel free to call on us.

hood that the Bank would be exposed to a risk of loss.

Similarly, with the other two ship loan categories, instructions re: the type of collateral to be obtained were ignored. With respect to charter party loans, the charter hire was often permitted to expire without any payments being made to Midland. On several occasions the assignment of charter parties was never acknowledged and when the charter hire proceeds came into the Bank, they were applied to the borrowers' accounts and not put towards the payment of the loan. Finally, the most flagrant disregard of the Board's security requirement came with respect to the letters of credit. More often than not, Pensec, who authorized every letter of credit but one, failed to insure there would be any money on deposit in the Bank to secure the transaction. Further, the Bank never charged or collected any fees in connection with these letters of credit.

When loans would become past due, Pensec and/or Moraites would bring them up to date with renewal loans. Certain loans were repeatedly renewed without any payments being forthcoming. The fact that the Bank was not making any money on these loans and that all of these notes were delinquent was concealed by Pensec, who in his monthly operating reports to the Board listed renewal notes as new loans. Whenever questioned by the Board about the status of the ship loans, Pensec never indicated that he was experiencing any difficulties, when in fact he knew that many of the loans were overdue and unpaid.

At the same time Pensec was authorizing unsecured loans to cover overdrafts in certain borrowers' accounts and similarly concealing this fact by listing such loans in his monthly operating reports as secured.

Pensec and Moraites further concealed from the Board the fact that a group of companies identified as the "K & M Group" operated in actuality as a single entity. The significance of this is that while Midland's books were made to reflect the granting of a number of small loans to individual, non-related companies, in reality, most of the proceeds were being funneled into an omnibus account for the benefit of a single borrower.

On several occasions, when a loan to one member of the K & M Group remained unpaid for too great a period of time, Pensec would authorize a "new" loan to another company in the K & M Group, the proceeds of which would be used to satisfy the unpaid note. When doing so, Pensec was not placing the Bank in any better position than it had been in with respect to the original loan. Rather, he was again merely concealing the fact that the ship loans were going unpaid.

From the time of the inception of the direct ship loan program in 1965 through July 1966, the volume of the loans increased rapidly. In May 1966, even as the Board increased the ceiling placed on the amount of bank funds which could be extended in any one of the three ship loan categories,[4] Pensec was authorizing loans whose amount in July 1966 exceeded the newly established limits by approximately $800,000. At no time did Pensec advise the Board of Directors that the loans which he had already booked and for which he was now seeking Board approval, exceeded the limits established by them. This Court finds that Pensec was well aware of the fact that the loans he authorized exceeded the Board's specified limits, and that because of the nature of the loans,[5] it would be virtually impossible for the Board to know whether they were staying within their prescribed limits unless they were so advised by Pensec.

4. The Board raised the limits from $500,000 in the three categories to $750,000 for loans secured by first preferred ship mortgages; $750,-000 for loans secured by charter party assignments and $1,000,000 for secured letters of credit.

5. As most of the loans had short maturity periods, the Court finds the Directors were operating under the assumption that Pensec was authorizing and presenting new loans, only as the earlier ones matured and, therefore, came off Midland's books.

The first indication received by the Directors that the loans exceeded their limits came as a result of the June 6, 1966 examination of Midland by the New Jersey Department of Banking and Insurance. On October 26, 1966 the report of examination along with a covering letter of the Chief Examiner was forwarded to the Bank. The report criticized the Bank in general terms for its concentration in the area of ship loans, noting that, " . . . More than the usual attention is warranted because of the inherent risk in any concentration." The covering letter, after noting that there were ship loans in excess of $2,000,000, $500,000 of which were in default, requested the Bank to make an expression of policy and objectives relating to the extent of this type of business anticipated to be undertaken in relation to the Bank's capital.

The report and covering letter were reviewed by the Board of Directors [6] at several meetings at which Director Moraites and President Pensec were questioned as to the specific criticisms of the Banking Department. Both men reassured the Board that there were no problems with the ship loans and that any delinquencies mentioned in the covering letter had been taken care of. On February 14, 1967 Pensec, as President of Midland, sent the Bank's reply to the Banking Department. The letter stated in pertinent part:

" . . . it is the intent and the policy of the Board of Directors and top management to maintain rather than increase and where possible decrease, our involvement, in loans and contingent credits to those firms whose primary interest is in the shipping industry."

Despite this assurance to the Banking Department that Midland intended to at least maintain the status quo, Moraites continued to refer and Pensec continued to approve new loans. In fact, there was a steady increase in the volume of ship loans

through the first half of 1967. In April 1967 the New Jersey Department of Banking and Insurance made another examination of the Bank. This 1967 report which was sent to the Bank by covering letter dated July 19, 1967 contained much stronger criticisms of the ship loans than the 1966 report.

The letter stated in pertinent part:

"This department is seriously concerned over the expansion of risk assets in your institution and particularly in the quality of a large segment, referred to hereinafter as 'ship loans,' and furthermore, the lack of control exercised by your managing personnel over this group of loans . . . We could go on at great length reiterating the criticisms our examiner has cited in his report concerning this concentration which, with its many hazards, threatens the very existence of your institution. You have acted with extreme imprudence, and you must now rectify this situation by negotiating the orderly reduction of these loans, until your involvement therein has been entirely eliminated."

Although Pensec received this letter by July 21, it was not brought to the Board's attention for some 2½ weeks, despite an opportunity to do so at an intervening executive committee meeting held on July 31. Instead, Pensec's immediate reaction was to place a phone call to Peter Moraites who was vacationing in Greece aboard the yacht of one of the Bank's larger "ship loan" borrowers. Present with Moraites in Greece, was Walter Jones, general counsel for Midland and one of its major stockholders. Moraites, however, never indicated to Jones that it was Pensec who called or what the problem was. He merely told Jones that he had to return to New York on business.

---

6. After reviewing the report and covering letter, each member of the Board of Directors was required by the New Jersey Commissioner of Banking to sign a certificate wherein they certified that they had made themselves familiar with the contents of the report of official examination and that they were also familiar with the contents of the covering letter.

This procedure was followed by the Board for each Report of Examination received from the New Jersey Department of Banking and Insurance hereinafter discussed.

As noted earlier, Pensec and Moraites concealed from the Board, until August 14, 1967, the report of the Banking Department. Despite their knowledge of the severe criticisms of the Banking Department and the admonition to the Bank to reduce these loans, Pensec authorized approximately $600,000 in new ship loans in between the time he received the report and the time he brought the existence of the report to the Board's attention.

Even when he finally revealed the existence of the report to the executive committee at the August 14 meeting, he withheld from them the strongest language of the July 19 letter. The letter was not circulated as Pensec merely "reviewed" its contents with the committee.

At the executive committee meeting Pensec was instructed to send a letter to the Department of Banking indicating the Bank desired an opportunity to discuss the problems at a full Board meeting, after which a thorough reply would be sent to the Department.

Additional copies of the report were ordered so the Board could study it thoroughly and finally, on October 16, 1967, Pensec was authorized to send the Bank's reply. Annexed to the Bank's reply dated October 18, 1967 was a schedule listing the various ship loans and their balances as of the date of the letter. That schedule, however, misstated the total amount of ship loans outstanding at the Midland Bank by $1,000,000. Although the defendant would have the Court attribute this gross inaccuracy to clerical errors of Pensec's subordinates, the Court believes the evidence indicates otherwise. Seven individual loan balances were understated in that schedule, and the Court concludes that Pensec deliberately misstated these amounts to conceal the true state of affairs from both the Commissioner of Banking and the Directors of Midland.

This understatement of the loan balance was not the only misrepresentation contained in the October 18th reply. In addition, there were several misstatements concerning the types of security held on particular loans.[7] For, in addition to criticizing the high concentration in ship loans, the July, 1967 report also condemned the vast deficiency in documentation. In his primary response to the Banking Commission following the August 14th executive committee meeting, Pensec had already assured the State that all the pertinent papers respecting ship loans were appropriately filed in the Bank. This, however, was not the case.

This Court finds that both the August 16th and October 18th reply letters and any accompanying schedules were prepared under the direction of John Pensec and that, from all the facts heretofore discussed, it is reasonable to conclude that he knew or should have known that they did not accurately reflect the true status of the ship loans.

Perhaps as a result of the concern over the ship loans, generated in the members of the Board of Directors by the July 1967 report, the Board on October 16, 1967 resolved to reduce the total amount of ship loans to an amount equal to ten percent of Midland's total resources. This would result in the then current balance of approximately 4.5 million dollars being reduced to some 2 million dollars.

During this same period in 1966–1967, Midland had been contemplating a merger with the Englewood National Bank. As a prerequisite to this merger, Midland had to obtain an audited financial statement prepared by a certified public accountant. On January 12, 1968, at the conclusion of this required examination, Raymond Perry, a

---

7. Specifically, Pensec misrepresented that: (1) a $75,000 loan to Astrosplender W. Nariera S.A. was secured by a Charter Party Assignment when in fact it was not; (2 & 3) that a $176,375 loan to Australine Shipping and a $130,312.50 loan to Elmsley Steamship Corp. were secured by a preferred ship mortgage— with periodic reductions to be instituted when in fact, the loan was secured by a second mortgage only and the reductions were never instituted; and (4) that a $75,000 loan to Trireme Compania was "secured by Time Charter Party Assignment, being refinanced to liquidate loan," when in fact the loan was not secured, refinanced or liquidated.

partner in the firm of E. R. Burt & Co., who acted as the official auditors for Midland, informed Pensec that he would not provide the bank with a "clean" letter of audit and that he would have to take exception to certain of the ship loan files because of a lack of documentation. Pensec thereupon brought this problem to the attention of Walter Jones, Midland's general counsel. Jones, greatly disturbed at this news, immediately sent Marvin Gladstone, an associate in his law firm, over to the Bank to investigate the situation and determine whether the ship loan files were as lacking in documentation as Perry had reported and to attempt to discern exactly what was missing. A meeting was scheduled in Jones' office for the following day to discuss the dilemma. Jones then called Peter Moraites requesting he attend the meeting and further instructing him to bring whatever documentation he may have had respecting any of the ship loans. Present at the January 13th meeting were Perry, Pensec, Moraites, Jones, Gladstone and Donald Salmon, a member of Midland's Board of Directors. From this day forward, Walter Jones assumed the responsibility of administering the ship loans and was given the authority to do whatever was necessary to reduce the outstanding loans.

At the January 13th meeting, it was decided to send Gladstone to London in an effort to obtain whatever was necessary from the K & M Group to straighten out their ship loan files. While in London, Gladstone made some renewal loans, obtained irrevocable undertakings to mortgage as collateral[8] and also executed a paydown agreement, which outlined a schedule of payments to which K & M was bound to adhere. Gladstone, in effect, arranged a restructuring of loans to the K & M Group, which placed Midland in a much sounder position. Following this series of events Perry issued Midland a clean audit report and the merger went through.

On February 16, 1968 both the New Jersey Department of Banking and the Federal Deposit Insurance Corporation made an official examination of Midland. On May 31, 1968, when the State Banking Authority's report was transmitted to Midland, Roger F. Wagner, the Chief Examiner for the State, requested that a special meeting of the Board be held in his office to discuss the report. Walter Jones was present at the meeting along with Midland's Board of Directors. While criticizing generally, Midland's ship loan program and advising the Board that $719,000 of the loans were "adversely classified" and another $2,205,000 were "especially noted" the Banking Department as of July 1968 still did not classify any of the loans as a loss. In fact, as of July 1968, neither the Bank, the F.D.I.C. nor the New Jersey Department of Banking seriously doubted the ultimate collectability of the ship loans. By way of resolution in February 1968, the Board of Directors refused to grant any new ship loans and under Jones' direction they were pursuing a steady course to liquidate the outstanding loans.

By October 1968, however, it became apparent that K & M would not be able to fulfill the paydown agreement as the loans began to fall into arrears. At this time, the New Jersey Department of Banking and the F.D.I.C. were conducting a special examination of Midland which was limited principally to ship loans and letters of credit made to three specific borrowing groups, which included the K & M, Bacalakis and Markogianis groups. On December 23, 1968 Chief Examiner Wagner advised the Bank that despite their continued efforts to achieve the best solution to a very difficult problem, it would be necessary for the Bank to either charge off these loans or to specifically set up a reserve in the amount of $1,700,000 to offset possible ship loan losses, prior to December 31, 1968. In compliance with this request, the Board of Directors, by resolution dated December 26, 1968, charged off $695,121.35 as loan losses and established a reserve of $1,000,000.

---

8. It was not until the following month, February 1968, that the actual mortgages were obtained as collateral.

With the charging-off of these loans came the realization that Midland stood the risk of incurring a substantial loss on the ship loans. As a result, the Board of Directors, for the first time, became suspicious of the validity of these loans in general and in January 1969 retained the law firm of Riker, Danzig, Scherer and Brown to investigate the matter. The Bank, in the Spring of 1969, also retained the accounting firm of Pogash & Co. to assist in the investigation.

Upon the completion of an initial review of the ship loan files, Peter Berkley, a member of the Riker firm, met with representatives of the defendant on March 20, 1969 to discuss the ship loans. The next day he sent a follow-up letter to F & D, which stated in pertinent part:

"We notified you at that time that the Bank has discovered a loss or losses under your Banker's Blanket Bond # 53 60 496 D, resulting from fraudulent or dishonest acts of officers and/or employees, and/or attorneys for the Bank, and loss of property in connection with a series of ship loans, letter of credit transactions, and related loan transactions entered into by the Bank and certain shipping interests. Notification of the discovery of such loss is provided to you in accordance with the provisions of Section 3 of the Bond."

Over one month later, by letter dated April 23, 1969, F & D forwarded Proof of Loss forms to Mr. Berkley. The letter written by Charles J. Herman, a claims attorney for the defendant, stated in pertinent part:

". . . We understand that the matters referred to in your letter are under continuing investigation by the Bank and that upon completion of such investigation, the Bank intends to file detailed Proofs of Loss."

During the Spring and on into the Summer of 1969, Pogash & Co. continued their in-depth investigation of Midland's ship loan files. It was not until early November of 1969 that Pogash orally reported their findings to the Riker, Danzig firm. Upon receiving this report, the Riker firm felt their earlier suspicions had been confirmed

and determined they now possessed sufficient knowledge to accuse Pensec and Moraites with the commission of dishonest, fraudulent and/or criminal acts in connection with the ship loans. Subsequently, on December 30, 1969 Midland filed its proof of loss forms with F & D.

Before turning to a discussion of the applicable legal principles, there are a few other factual contentions which must be considered.

The defendant has introduced evidence to the effect that during the period of 1966–1967, when the heavy volume of ship loans was being booked at Midland, Pensec was so deeply involved with the Bank's building and expansion program that he had very little time to supervise the administration of the ship loans. The Court concludes that Pensec was indeed kept busy and drawn away from the Bank a great deal of the time while supervising all phases of the construction of several branch offices and a new main office building; however, the Court further concludes that despite this fact, Pensec remained in complete control of the daily administration of the ship loans. Virtually every ship loan was placed on Midland's books upon the personal instruction of Pensec. No other officer or director, with the sole exception of Moraites, possessed such authority and even in the case of Moraites, verification would later have to be sought from Pensec. In addition, Pensec personally advised the tellers as to both the application of the ship loan proceeds and as to what type of collateral would be obtained and accepted on the loans. Further, the tellers were in the habit of speaking with Pensec at least several times a week on ship loan matters alone. Thus, it appears to this Court that despite any outside activities, Pensec always managed to remain at the helm of the ship loan transactions.

Finally, the defendant argues that Pogash & Co. did not find any fact concerning the making of the ship loans which had not previously been found and reported to the Board of Directors by the bank examiners in their five reports of examination dating

from June 1966 through March 1969. Considering at this time the sole question of whether the contents of the reports were indeed identical and not presently making any determination as to when the members of the Board should have discovered any alleged dishonest act, the Court must conclude that the Pogash Report did in fact reveal certain facets of the ship loan transactions which the Banking Reports failed to disclose. This, however, should not be surprising, for as an examiner for the F.D.I.C. testified, governmental authorities generally conduct only an "examination" which could not possibly be comparable in detail to the "audit" of the Bank's books conducted by Pogash.

Among the details reported by Pogash which the Bank examiners missed, included the fact that many loans were renewals or "roll-overs" while being listed as new; that loans were being booked to cover overdrafts and thus clear checks for which there were insufficient funds in the Jopkat checking account; that misrepresentations were being made by Pensec regarding various aspects of the ship loan program to the Board of Directors at their meetings and to the State regulatory agency in several of his replies to their reports; and, finally, the fact that Pensec and/or Moraites were receiving cash payments from the accounts of ship loan borrowers.[9] One specific incident occurred on September 11, 1967 when Pensec received $6,250 in cash from the Jopkat account. Pensec did not give the teller a receipt for this amount and when the teller inquired what type of explanation he should put on the charge ticket, Pensec instructed him to designate it as "cash for captain." The above constitutes a few examples of additional facts exposed by the generally more detailed audit of Pogash & Co.

As this diversity action involves the interpretation of and the recovery upon an insurance contract delivered and to be performed in the State of New Jersey, the substantive law of New Jersey must be applied. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

With this in mind, the first issue which should be resolved is whether any alleged dishonest acts committed by Peter Moraites, either as an "Employee"[10] or Director of Midland would be covered by the bonds. It must be remembered that in construing an insurance policy, it is presumably the intention of the insurer to have the insured understand that in the event of loss he will be protected to the full extent that any fair interpretation of the contract will allow. *Danek v. Hommer*, 28 N.J.Super. 68, 76, 100 A.2d 198 (App.Div.1953) *aff'd*, 15 N.J. 573, 105 A.2d 677 (1954); *Reese Cadillac Corp. v. Glens Falls Insur. Co.*, 59 N.J. Super. 118, 126, 157 A.2d 331 (App.Div. 1960). Thus, insurance contracts are to be liberally construed in favor of the policyholder and strictly construed against the insurer in order to afford the protection which the insured sought in applying for the insurance. *Reese Cadillac Corp., supra* at 126, 157 A.2d 331; *Schneider v. New Amsterdam Cas. Co.*, 22 N.J.Super. 238, 242, 92 A.2d 66 (App.Div.1952).

The defendant advances two arguments in favor of a finding that Moraites was not covered by the bonds. Primarily, while not disputing the fact that Peter Moraites acted as counsel for Midland on the ship loan transactions, the defendant argues that he was not an attorney employed by the Bank within the meaning of the bonds, for he was never "retained by the Insured to perform legal services." Additionally, the defendant argues that any acts committed by Moraites in his capacity as a Director of the Bank are specifically excluded from coverage by virtue of the following Director's Exemption Clause which appears in the bonds:

**9.** In 1971, both Pensec and Moraites were convicted for acts relating to the ship loan transaction. Specifically, Moraites pled guilty to two counts of accepting illegal fees in connection with the ship loans, while Pensec was found guilty of conspiracy to misapply funds of Midland and three counts of specific misapplication of funds.

**10.** See, Footnote 2 for the definition of the term "employee."

"Section 1. This Bond Does Not Cover: (C) Any loss resulting wholly or partly from the wrongful act or default of any of the directors of the Insured who are not employed by the insured at a salary, except each director who handles or has charge or custody of money, securities or other valuable property of the Insured or of its customers."

Turning to the defendant's first argument, as noted above, F & D does not deny that Moraites served as Midland's counsel on the ship loans, rather they contend that neither Moraites nor his firm were ever "retained" to perform legal services, within the meaning of the bonds. Defendant's argument focuses on the fact that the Bank never paid Moraites a retaining fee and, further, that he was not admitted to the practice of law in the State of New Jersey. Equating the word "retained" as used in the bond with the meaning of the word "retainer," defendant asserts that in the absence of being paid a fee, Moraites could not have been employed by the Bank to perform legal services. This Court feels, however, the construction of the clause urged by the defendant is too narrow. In addition to connoting the payment of a fee, "retain" means generally "To engage the services of an attorney or counsellor to manage a cause." Black's Law Dictionary (Rev. 4th ed. 1968). It has been held on several occasions that payment of a fee is not necessary to give rise to the employment relationship of attorney-client. *Shoup v. Dowsey,* 134 N.J.Eq. 440, 475, 36 A.2d 66 (Ch.1944); *E.F. Hutton & Company v. Brown,* 305 F.Supp. 371, 388 (S.D.Tex.1969). Whether an employment situation was intended to be created can be implied from the conduct of the parties. "While the relationship may be said to rest upon contract, formality is not an essential element of the employment." *Shoup v. Dowsey, supra,* 134 N.J.Eq. at 476, 36 A.2d at 85. Thus, the fact that Moraites was not hired, for example, by a formal resolution of the Board of Directors, would not preclude a finding that Moraites was retained by the Bank as their ship loan counsel. Nor does the fact that Moraites was licensed to practice law solely in the State of New York have any effect on whether an employment relationship existed. Although Moraites could not appear in New Jersey courts unless admitted *pro hoc vice,* there was no bar against him acting as counsel for the Bank in preparing all the necessary documentation.

This Court is therefore of the opinion that Moraites was in fact "retained by the Insured to perform legal services," and, therefore, was an employee of the Bank within the meaning of the bonds.

In addition, this Court finds that Moraites' acts were covered under the bond by virtue of the exception in the Director Exemption Clause, which provides coverage for each director who handles or has charge or custody of money, securities or other valuable property of the Insured. Moraites, at some point in most of the ship loan transactions, had custody of the collateral in whatever form, advanced for the loan. This security, in the opinion of the Court, constitutes "other valuable property of the Insured," and, therefore, any alleged dishonest, fraudulent or criminal acts committed by Moraites would be covered under the bond.

With the knowledge that the fidelity bonds afforded coverage to the Bank for the acts of both John Pensec and Peter Moraites, the Court will now turn to the question of whether these men committed dishonest and fraudulent acts in connection with the booking, renewing and administering of the ship loans.

It is generally recognized in New Jersey that fidelity bonds indemnifying employers against dishonest acts of their employees are to be broadly construed. *Mortgage Corp. of N. J. v. Aetna Cas. & Surety Co.,* 19 N.J. 30, 36, 115 A.2d 43 (1955); *Reese Cadillac Corp. v. Glens Falls Insur. Co.,* 59 N.J.Super. 118, 126, 157 A.2d 331 (App.Div.1960); *Essex County State Bank v. Fireman's Fund Ins. Co.,* 331 F.Supp. 931, 937 (D.N.J.1971).

As the New Jersey Supreme Court has noted, the comprehensive title of these policies, "Brokers Blanket Bond," and their

wide coverage of "fidelity" losses through "dishonest, fraudulent or criminal" acts of employees, "evidence the clear intent to protect the employer against employees' wrongful acts which, though not criminal, nevertheless display significant lack of probity, integrity or trustworthiness." *Mortgage Corp. of N. J., supra* 19 N.J. at 36, 115 A.2d at 46. Although these terms are to be given a broad signification and taken most strongly against the surety company, the coverage of the bonds will not extend to acts which constitute mere negligence, mistake, error in judgment or incompetence. *Mortgage Corp. of N. J., supra* at 37, 115 A.2d 43; *Reese Cadillac Corp., supra*, 59 N.J.Super. at 126, 157 A.2d 331.

■ When applying the above principles to the facts of this case, the Court can reach no other conclusion than that the conduct of both Pensec and Moraites in relation to Midland's ship loan transactions constituted dishonest and fraudulent acts within the meaning of the fidelity bonds. Both men pursued a course of conduct which at its minimum can be described as lacking in principle. As employees and directors of the Bank, each one violated the fiduciary trust he owed to the Bank by displaying a reckless disregard for Midland's welfare in the carrying out of his responsibilities. "We are not dealing with an instance of neglect, mistake or incompetence, nor are we dealing with an isolated inadvertent or insignificant delinquency by an employee." *Mortgage Corp. of N. J., supra*, 19 N.J. at 40, 115 A.2d at 48. The acts of both Pensec and Moraites extended over a period of two years. Knowingly listing renewal loans as new loans and then assuring the Board that there are no delinquencies; authorizing unsecured loans in direct violation of Board instructions and knowingly making false reports, both oral and written, to not only their fellow Bank Directors, but also the New Jersey Banking Department, certainly constitutes conduct which displays a significant lack of probity, integrity and trustworthiness.

Perhaps the incident which best displays Pensec's and Moraites' severe lack of integrity was the action taken by them following receipt of the July 1967 Report of Examination from the N.J. Banking Department, when for over two weeks they withheld from their fellow Directors the existence of that critical report. Then, despite their knowledge of the fact that the Banking Department was of the opinion that the heavy concentration of ship loans threatened Midland's very existence and was, therefore, urging the Bank to reduce these loans, they went out and booked over $600,-000 in new loans before revealing the existence of the Report to the Board.

■ The dishonest and fraudulent acts of Pensec and Moraites touched all phases of the ship loan program. The Court concludes that the losses sustained by the Bank were caused through these acts. There is no need to show the existence of a specific dishonest and fraudulent act with respect to every individual transaction where, as here, the dishonest conduct of the employees which caused the loss permeated the entire course of dealings. See, *Fidelity & Deposit Co. of Maryland v. Usaform Hail Pool, Inc.*, 523 F.2d 744, 757 (5th Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976).

The defendant seeks to avoid its liability under the bonds on the ground that the plaintiff has allegedly failed to comply with the notice provisions of the bond. These provisions provide in pertinent part:

"At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery, furnish . . affirmative proof of loss . . . Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed . . . nor after the expiration of twenty-four months from the discovery of such loss . . . ."

■ The defendant contends that Midland "discovered" the "loss" when it learned of the dishonest or fraudulent acts of Pensec and Moraites, on December 19, 1966, when the Board of Directors certified to the

New Jersey Department of Banking and Insurance that they were familiar with the contents of the June 1966 report of examination and its covering letter. F & D argues that based on the contents of this report, the Directors had to have full knowledge of the condition of the ship loans and letters of credit. The argument continues that if Pensec's and Moraites' acts in making the loans listed and condemned in the June 1966 report are dishonest and fraudulent "now," they were just as dishonest and fraudulent when the loans were originally made. The defendant adds that if there is any doubt that Midland learned of the acts in 1966, the severe condemnation of all ship loans and letters of credit contained in the April 1967 report of examination provided them with ample knowledge of the facts.

The Court concludes, however, that the mere fact that the Directors may have had knowledge, by virtue of the 1966 and 1967 reports of examination, that the amount of ship loans was excessive and their documentation poor, was not by itself sufficient to warrant a conclusion by them that Pensec and Moraites were guilty of dishonest acts. ". . . Inefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as [with] their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist." *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 365 (8th Cir. 1971).

█ The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice "until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [insurer] in liability for the misconduct." Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing. *American Surety Co. v. Pauly*, 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898); *see also, Federal Deposit Insurance Corp. v. Lott*, 460 F.2d 82, 87 (5th Cir. 1972).

█ The question then is when in fact did the Bank discover the loss?

The defendant has argued that if the loss was not discovered in 1966–1967, then it was discovered in March 1969, when Peter Berkley sent a letter to F & D on behalf of Midland stating: ". . . the bank has discovered a loss . . . ." Seizing upon this language, the defendant contends that as the loss was discovered in March and the proof of loss forms were not filed until December, the Bank has still failed to comply with the notice requirements.

At trial, Mr. Berkley testified that in spite of the inartful wording of the letter, he was merely trying to convey to F & D the suspicions which had been aroused at Midland. This Court has no reason to doubt the credibility of Mr. Berkley and, therefore, concludes that as of March 1969 the plaintiff possessed no more than a mere suspicion of foul play and, thus, was under no duty at that point to notify F & D of the loss. This conclusion is further supported by the defendant's response to Mr. Berkley's letter wherein they acknowledged the fact that F & D understood the matter was under continuing investigation and that the Bank would forward its proof of loss upon completion of the same.

It is the opinion of this Court that it was not until the Bank received the oral report of the audit conducted by Pogash & Co. in November 1969, and were presented with some incriminating facts, that they acquired knowledge of some specific fraudulent or dishonest act which triggered their obligation to notify F & D of the loss.

Although perhaps the Directors should have been more leary of the validity of the ship loans after receiving several cautionings from the Banking Department, their failure to uncover the acts sooner cannot defeat their right to recover under the bonds. ". . . Neither negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the Bank of dishonesty, or a positive breach of an imperative condition, will

defeat claims for loss caused by that dishonesty, unless it is otherwise provided in the contract." *See, Miami National Bank v. Pennsylvania Insurance Co.,* 314 F.Supp. 858, 865 (S.D.Fla.1970); *Arlington Trust Co. v. Hawkeye-Security Insurance,* 301 F.Supp. 854, 858 (E.D.Va.1969); *American Employers' Insurance Co. v. Cable,* 108 F.2d 225, 227 (5th Cir. 1939).

Advancing two final arguments in an attempt to avoid liability under the bonds, F & D contends: (1) that the plaintiff with full knowledge of the facts surrounding the making and administration of the ship loans, ratified Pensec's and Moraites' actions and, therefore, the Bank is precluded from recovering on the bonds; and (2) the plaintiff, by settling claims against third parties, has destroyed F & D's rights of subrogation, thereby releasing the defendant from all liability under the bonds.

Considering F & D's first argument, the Court finds the actions of the Board were of a general nature, authorizing all previous acts of Pensec and Moraites and ratifying the same. This Court concludes these belated blanket authorizations and approvals were ineffective. Although the Directors may have been given the names of the borrowers and the amounts of the loans, they did not have knowledge of all the material facts which is a prerequisite to ratification. Additionally, it is generally recognized that fraudulent or dishonest acts cannot be ratified. *See, General Finance Corp. v. Fidelity & Cas. Co. of N. Y.,* 439 F.2d 981, 986 (8th Cir. 1971).

Section 5 of the bonds deals generally with F & D's right to subrogation. That section provides in pertinent part:

"If the Insured shall sustain any loss or losses covered by this bond which exceed the amount of coverage provided by this bond plus the Deductible Amount, the Insured shall be entitled to all recoveries made after payment by the Underwriter of loss or losses covered by this bond . . by whomsoever made, less the actual cost of effecting such recoveries, until reimbursed for such excess loss or losses; and any remainder, or, if there be no such excess loss or losses, any such recoveries shall be applied first in reimbursement of the Underwriter, and thereafter in reimbursement of the Insured for that part of such loss or losses within such Deductible Amount. The Insured shall execute all necessary papers to secure to the Underwriter the rights herein provided for."

As of February 1970 Midland Bank's loss on ship loans totaled $3,011,138.28. Through various collection efforts, Midland has reduced its loss to $2,634,027.77. The total coverage afforded by the fidelity bonds is $1,750,000. Thus, even after payment by F & D of the policy limit, Midland will still have a loss of almost $1,000,000. The defendant contends that through the action employed by Midland in reducing the amount of their original loss, Midland has destroyed F & D's right to subrogation. The Court concludes, however, that pursuant to Section 5 above, F & D's right to subrogation would not arise until Midland has been reimbursed for the total amount of its loss where, as here, the loss exceeded the amount of coverage provided by the bond.

Additionally, as subrogation is basically an equitable principle, equity would not be served if F & D were permitted to escape its liability under the bonds because Midland tried to mitigate its losses after the defendant denied its liability.

Accordingly, judgment in the amount of $1,750,000 will be entered on the bonds in favor of Midland, along with interest as of the date of entry of the judgment in accordance with this District's adoption of the appropriate New Jersey rule.

The Court, after having thoroughly considered the arguments of counsel on the issue of attorney's fees, hereby denies plaintiff's application for fees and costs. The plaintiff shall submit an appropriate judgment within seven (7) days from the date hereof.