AETNA INSURANCE COMPANY, AS SUBROGEE OF HIGINIO OTERO, PLAINTIFF–APPELLANT, v. GILCHRIST BROTHERS, INC. AND JOHNNIE S. BELL, DEFENDANTS–RESPONDENTS.

Argued September 24, 1980—Decided April 7, 1981.

552

*Lane M. Ferdinand* argued the cause for appellant (*Methfessel and Werbel*, attorneys).

*Elliott Abrutyn* argued the cause for respondents (*Morgan, Melhuish, Monaghan and Spielvogel*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This automobile accident case presents issues concerning the "single controversy" doctrine and subrogation rights of a liability insurance carrier covering the automobile involved.

The facts are undisputed. On April 5, 1975 at about 6:30 p. m., Higinio Otero was in his Ford automobile which was stopped on the shoulder of the northbound lanes of the New Jersey Turnpike in Edison Township. Johnnie S. Bell drove a Mack tractor and trailer owned by Gilchrist Brothers, Inc. into the rear of the Ford so that it traveled over 110 feet before coming to rest. Otero was seriously injured. He started a suit against Bell and Gilchrist in May 1975. Before that action came to trial, Otero died. His widow, Georgina Otero, continued the litigation as administratrix and administratrix ad prosequendum, having amended the complaint to add a count for wrongful death. The suit was settled by defendants' insurer Home Indemnity Company (Home) in July 1976 for $219,000.

Higinio Otero was the named insured under an automobile liability policy issued by the Aetna Insurance Company (Aetna), covering his Ford automobile. The policy contained a New

Jersey Basic Personal Injury Protection Endorsement (PIP) which required that Aetna pay Otero certain losses (medical expense, income loss, etc.) related to personal injury caused by accidents arising out of the use "of a private passenger automobile." *N.J.S.A.* 39:6A–4. Aetna paid Otero approximately $30,000 because of that obligation.

Aetna advised Home, the insurer of Bell and Gilchrist, of its subrogation claim in August 1975, and Home in a letter dated November 12, 1975 rejected the claim, asserting that there was no legal basis for subrogation. Home's settlement of the Otero claim occurred, as noted above, in July 1976.

Aetna then instituted this suit as subrogee of Otero against Bell and Gilchrist Brothers, Inc. seeking reimbursement of the sums paid under the PIP endorsement. Defendants moved for summary judgment and Aetna moved to strike defendants' separate defenses of the general release given by Otero in the July 1976 settlement and the lack of a statutory right under *N.J.S.A.* 39:6A–9 to subrogation after December 31, 1974.

The trial court granted defendants' motion. Reasoning that the PIP payments were mandated by the No Fault Act, *N.J.S.A.* 39:6A–1 *et seq.*, a statute enacted to provide quick and efficient reimbursement to automobile accident victims for out-of-pocket expenses, it held that Otero was barred from recovering those same expenses under *N.J.S.A.* 39:6A–12 (section 12). To permit recovery would be contrary to the plain meaning of that provision and *N.J.S.A.* 39:6A–9 (section 9) which had eliminated subrogation rights after January 1, 1975.

The Appellate Division affirmed but not on the basis of the trial court's holding regarding subrogation rights. It held that Aetna should have asserted its claim in Otero's suit against Bell and Gilchrist and that its failure to have done so violated the "single controversy" doctrine. Accordingly, Aetna's action was now barred.

We granted plaintiff's petition for certification. 82 *N.J.* 297 (1980).

## I.

█ The Appellate Division erred when it held that the single controversy doctrine is applicable to this situation.[1] The single or entire controversy doctrine evolved "to eliminate delay, prevent harassment of a party and unnecessary clogging of the judicial system, avoid wasting the time and effort of the parties, and promote fundamental fairness." *Barres v. Holt, Rinehart and Winston, Inc.*, 74 *N.J.* 461, 465 (1977) (Schreiber, J., dissenting). These goals motivated the judicial reform expressed in the Constitution of 1947. The Report of the Committee on the Judiciary in that Constitutional Convention reminds us that an outstanding defect in the then existing court structure was

the intolerable evil of jurisdictional controversies engendered by rival courts of law and equity dealing with the same subject matter. Even where the function of each tribunal is clearly understood and not in dispute, the dual court structure necessarily entails fractional and multiple litigation of the same controversy. [II *State of New Jersey Constitutional Convention of 1947* at 1182]

Creation of a Superior Court, with original general jurisdiction throughout the State in all causes, Art. VI, § 3, par. 2, which is required to grant legal and equitable relief "so that all matters in controversy between the parties may be completely determined," Art. VI, § 3, par. 4, was a significant step in the advancement of the entire controversy doctrine. Justice Burling observed in *Massari v. Einsiedler*, 6 *N.J.* 303, 313 (1951):

It is the cornerstone of our present court structure that all matters, whether legal or equitable, in a controversy be disposed of in one suit in one court to the end that a multiplicity of suits may be obviated.

█ This policy requires that a party include in the action all related claims against an adversary and its failure to do so

---

[1]The Appellate Division rationale recognized that two separate claims were involved, one for subrogation with respect to the PIP payments and the other for the insured's damages ex the PIP payments. Issues of *res judicata* and collateral estoppel aside, the Appellate Division applied the single controversy doctrine because of a failure to join all the parties in the one action.

precludes the maintenance of a second action.[2]  Several decisions of this Court have advocated that proposition.  The leading opinion is that of Justice Brennan in *Ajamian v. Schlanger*, 14 *N.J.* 483 (1954), *cert. den.* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954).  The plaintiff's assignor had unsuccessfully sought rescission of a contract, the court holding that ratification barred recovery.  Thereafter, the plaintiff sued for damages based on the deceit which had induced him to enter into the agreement. Justice Brennan, after calling attention to a "fundamental objective" of the constitutional reform "to avoid the delays and wasteful expense of the multiplicity of litigation which results from the splitting of a controversy" and the "simple and flexible procedural framework designed and proposed for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants," *id.* at 485, held that, since both remedies—rescission and damages—could have been maintained in the first action, preclusion of the action for damages "must follow if the policy to avoid undue litigation is not to be emptied of substance," *id.* at 488.

The effect of *Ajamian* was to require a party to join all its claims against its adversary when those claims were related to and part of the same controversy.  *Tevis v. Tevis*, 79 *N.J.* 422, 434 (1979); *Applestein v. United Board & Carton Corp.*, 35 *N.J.* 343, 356 (1961); *Silverstein v. Abco Vending Service*, 37 *N.J.Super.* 439, 449 (App.Div.1955).

In *Falcone v. Middlesex County Med. Soc.*, 47 *N.J.* 92 (1966), upon dismissing a second suit between the same parties for damages, the prior action having been for a judgment compelling plaintiff's admission into the defendant medical society, this Court reiterated the rule:

> In any event, elemental considerations of fairness to the other party and the urgent need for eliminating the delay and wastage incident to the fragmentation of litigation dictated that all of the aspects of the plaintiff's controversy with

---

[2]The rule is derived from principles of *res judicata*.  See *Restatement, Judgments* 2d (Tent. Draft No. 5, 1978), § 61 at 152–153.

the defendant be included within his legal proceeding. See 2 *Schnitzer and Wildstein, New Jersey Rules Service* A–IV–933 *et seq.* (1957). [*Id.* at 94, 219 *A.* 2d 505.]

Though the preclusionary result of nonjoinder of claims existed in the case law, the Rules at that time provided only for permissive joinder of claims. *R.* 4:27–1(a), and its predecessors, *R.R.* 4:31–1 and *R.* 3:18–1 (*Fed.R.Civ.P.* 18(a)). The Rules were not updated to reflect the single controversy principle until 1979 when *R.* 4:27–1(b) was adopted stating:

[e]ach party to an action shall assert therein all claims which he may have against any other party thereto insofar as may be required by application of the entire controversy doctrine.

█ In the instant case preclusion would have to be predicated on the failure to have joined Aetna as a party to the Otero litigation. However, the preclusive effect of nonjoinder of claims arising out of a single dispute or wrong between the parties may not automatically be applied to a failure to join a person as a party to the action. That is a different pattern, involving different considerations. The most significant distinguishing feature is that application of the principle would prevent a non-party from prosecuting its claim or presenting its defense.

In *McFadden v. Turner*, 159 *N.J.Super.* 360 (App.Div.1978), Judge Pressler commented on this distinction. In that case an injured plaintiff, who had recovered against an employer via vicarious liability, was permitted to maintain a second action against the employee when the plaintiff could not recover all her damages from the employer. Judge Pressler wrote:

Although we are convinced that it is far preferable for the co-obligors to be joined in a single action and while the temptation to require that to be done by an application of the entire controversy doctrine is formidable, we nevertheless adhere to our former determination that in those circumstances the joinder rule is permissive and not mandatory. We reach that conclusion because of our continued perception of the entire controversy doctrine as a rule of mandatory joinder of claims, not of parties. As we understand the doctrine, its essential purpose is to assure a party to litigation that that litigation will be conclusive as to the entire matter which is its real subject. It is in effect a principle of repose intended to protect one who is already a party to litigation from the expense, delay and harassment implicit in multiple successive actions whose individual

scopes are limited to only a fragment of the complete dispute. As we said in *Wm. Blanchard Co. v. Beach Concrete Co., Inc.,* 150 *N.J.Super.* 277, 293–294 (App.Div.1977), the jurisprudential basis of the doctrine is the conception that litigants in an action should not be required, after final judgment therein is entered, "to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions." Thus the entire controversy doctrine operates, and was intended to operate, to prevent a party from being compelled to successively litigate. Being compelled to successively litigate does not, however, mean that one may not elect to successively litigate so long as he has a viable cause of action to litigate and so long as his election does not result in another's compulsion. [*Id.* at 369–370]

Our research has not disclosed any case in this State where the single controversy doctrine precluded a second action because of a failure to join parties. *Thatcher v. Jerry O'Mahony, Inc.,* 39 *N.J.Super.* 330 (App.Div.1956), referred to the principle in a situation where indispensable parties had not been joined. There, plaintiff in his capacity as a stockholder sued a corporation to invalidate a stockholder's ratification of an agreement which provided for stock options. Plaintiff, if successful in that action, intended then to seek to invalidate three stock options granted to certain directors. In dismissing the action Judge Goldmann referred to the policy "against subdividing a single controversy by resort to fractional litigation," *id.* at 335, and suggested the entire controversy doctrine justified dismissal. However, the suit was dismissed not because there had been a prior final adjudication between the parties, but because of the absence of indispensable parties, the three directors.

It may be that under some circumstances the failure of a party to be joined or to intervene in a prior action should, after adjudication, bar a second action against that party involving the same subject matter. Thus, if Aetna, subrogated to Otero's claim for medical expenses against Gilchrist and Bell, were an indispensable party, then that action should not have proceeded without it and it would not be barred from now pursuing relief. Or if Aetna, though not an indispensable party but a proper or desirable one, was aware of Otero's ongoing lawsuit, sat idly by and permitted the action to proceed to judgment without inter-

vening, perhaps preclusion of subrogation litigation by Aetna against Gilchrist should be in order. However, our Rules have not required such intervention and, even if we were so inclined, it would be unfair to state a new procedural rule to preclude a party from having its day in court.[3] Moreover, we do not reach that issue because, the matter having been settled, no trial was held and Otero did not obtain a judgment.

## II.

The defendant also advocates that the general release received from Otero in the settlement is a complete defense. However, the release would not operate to that extent unless that was the intent of the parties, including Aetna. See *Cartel Capital Corp. v. Fireco of New Jersey*, 81 *N.J.* 548, 559–561 (1980); *Breen v. Peck*, 28 *N.J.* 351 (1958); *Daily v. Somberg*, 28 *N.J.* 372 (1958). The correspondence between the insurance companies prior to the release, in which Home rejected Aetna's claim for reimbursement, reveals that defendant had notice of Aetna's claim. Therefore, the release could not affect Aetna's rights unless it participated in the settlement and release. See *Melick v. Stanley*, 174 *N.J.Super.* 271 (Law Div.1980).

## III.

Subrogation may exist by virtue of (1) an agreement between the insurer and the insured, 44 *Am.Jur.2d*, *Insurance*, § 1820 at 746, (2) a right created by statute, 16 *Couch on Insurance* 2d, § 61:6 at 240 (1966), or (3) a judicial "device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it." *Standard Accident Ins. Co. v. Pellecchia*, 15 *N.J.* 162, 171 (1954); *Ambassador Ins. Co. v. Montes*, 76 *N.J.* 477, 484 (1978). The underpinning of subrogation is its derivative nature. The insurer obtains only

---

[3]We are requesting the Court's Civil Practice Committee to review the rules on compulsory joinder of parties in the perspective of the entire controversy principle.

the right of the insured against the tortfeasor subject to defenses of the wrongdoer against the insured. *Hartford Fire Ins. Co. v. Riefolo Constr. Co.*, 81 *N.J.* 514, 523 (1980). The general rule has been stated as follows:

> Consequently, the insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. This principle has been frequently expressed in the form that the rights of the insurer against the wrongdoer cannot rise higher than the rights of the insured against such wrongdoer, since the insurer as subrogee, in contemplation of law, stands in the place of the insured and succeeds to whatever rights he may have in the matter. [44 *Am.Jur.2d, Insurance,* § 1821 at 748.]

To the same effect see 6A *Appleman, Insurance Law and Practice,* § 4051 at 103–127 (1942); 16 *Couch on Insurance* 2d, § 61:36 at 260–262 (1966).

■ Therefore, the rights of the insured beneficiary, the subrogor, become the rights of the subrogated insurer. No additional rights are created. No new cause of action comes into existence. Furthermore, it is immaterial whether the subrogor's cause of action is created by statute, arises because of judicially ascribed equities or exists because of a conventional agreement of the parties. *A & B Auto Stores, Inc. v. City of Newark,* 103 *N.J.Super.* 559, 569–570 (Law Div.1968).

In this case, Aetna's insurance policy contained an express provision for subrogation with respect to PIP payments. The policy reads:

> Subrogation. In the event of any payment under this endorsement [the New Jersey Basic Personal Injury Protection Endorsement], the Company [Aetna] is subrogated to the rights of the person for whose benefit such payments were made, to the extent of such payments, and such person must execute and deliver instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

This language traces the traditional legal concept of subrogation, namely that a subrogee becomes the beneficiary of the rights of the person for whose benefit the payments were made to the extent of those benefits.

■ The issue then is what rights Otero had which would have entitled him to recover from Gilchrist and Bell those expenses incurred as a result of the automobile accident and

paid as part of the PIP coverage under the Aetna policy. The answer is none. It is none because the New Jersey Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 *et seq.*, which mandates that every automobile liability insurance policy must provide PIP coverage, has eliminated the ability of the insured in an action in this State to recover damages from the tortfeasor for the amounts collectible or paid under PIP. *N.J.S.A.* 39:6A–12 states that:

> Evidence of the amounts collectible or paid pursuant to [the personal injury protection and additional personal injury protection coverage] is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.

In enacting the No Fault Act the Legislature determined that subrogation should not be allowed for PIP benefits and expressed the policy that an insured was not entitled to double recovery of the same damages. *Iavicoli,*[4] *No Fault & Comparative Negligence in New Jersey* at 117 (1973), points out that:

> It was intended by the Automobile Insurance Study Commission and by the Legislature to preclude the institution of actions for those losses which were satisfied by personal injury protection coverage.

Thus, the subrogation provision in the insurance policy is inoperative when, as here, the right of the injured person to maintain an action for PIP payments has been extinguished by the evidential exclusion rule.

Aetna argues that *Cirelli v. The Ohio Casualty Ins. Co.,* 72 *N.J.* 380 (1977), must lead to a contrary result. Not so. *Cirelli* involved an accident which occurred in New York between a New Jersey vehicle owned and operated by New Jersey residents (Cirelli) and a New York automobile owned and operated by New York residents (Natelli). Cirelli brought a declaratory judgment action against his insurance carrier (Ohio Casualty) to compel it to abide by the terms of the PIP payments in accordance with the New Jersey act. Also involved in the suit was Ohio's claim that its policy provision required Cirelli to reim-

---

[4]Mario Iavicoli served as legal counsel to the Automobile Insurance Study Commission, J.Res.No. 4, 194th Leg. (1970).

burse Ohio for PIP payments to the extent that Cirelli recovered those payments in the New York suit against Natelli.

The exclusionary evidence rule of *N.J.S.A.* 39:6A–12 which would have prevented the insured from proving the amount of the PIP payments in a New Jersey suit against Natelli was not binding on the New York court. In his New York suit Cirelli would be able to introduce evidence of the amounts already recovered through PIP benefits. To deny subrogation under those circumstances would be to allow Cirelli double recovery, a result clearly contrary to public policy and the statutory objective of reducing insurance costs underlying the No Fault Act.

We also observed in *Cirelli* that in addition to the inability to compel the New York court to apply the New Jersey evidence rule, the insurance intercompany arrangements for settling claims between carriers as provided in *N.J.S.A.* 39:6A–9 could not be applied. The Cirelli accident had occurred on March 1, 1974. This date had some significance because at that time *N.J.S.A.* 39:6A–9 was effective. It read as follows:

> Any insurer paying benefits in accordance with the provisions of section 4 and section 10, personal injury protection coverage, regardless of fault, shall be subrogated to the rights of any party to whom it makes such payments, to the extent of such payments. Such subrogated insurer may only by intercompany arbitration or by intercompany agreement exercise its subrogation rights against only the insurer of any person liable for such damages in tort provided, however, that such insurer may exercise its subrogation rights directly against any person required to have in effect the coverage required by this act and who failed to have such coverage in effect at the time of the accident. The exemption from tort liability provided in section 8 does not apply to the insurers' subrogation rights. On and after 2 years from the effective date of this act the provisions of this section shall be inoperative.

We did not find this provision relevant in *Cirelli* because it was a New York accident involving a New York automobile and Cirelli contemplated New York litigation. We noted that it was doubtful whether the Legislature had the power to compel an out of state insurer to arbitrate. The mandatory arbitration provision did not, therefore, apply in *Cirelli.* 72 *N.J.* at 386.

Reference was also made in *Cirelli* to a policy purpose enhanced by sections 9 and 12 to eliminate the uneconomic shifting of dollars from one insurance company to another. See *Iavicoli, No Fault & Comparative Negligence in New Jersey* at 117 (1973). This policy would not be contravened by permitting reimbursement against the New York residents or their insurance carrier. Though elimination of subrogation rights among New Jersey carriers may operate to reduce premium costs due to lower administrative expenses, that factor may be absent when out of state insurance carriers are involved and the reciprocal benefits among insurance companies operating in New Jersey are missing.

The *Cirelli* case is distinguishable from *Aetna* for several reasons. As we have seen, *Cirelli* did not fit within the pattern of sections 9 and 12. Neither the evidence rule of section 12 nor the reasons for eliminating subrogation applied. On the contrary in this case the section 12 exclusionary rule can be enforced in the New Jersey trial and significant reasons for eliminating subrogation will be satisfied.

The evidence rule in *N.J.S.A.* 39:6A–12 which prohibits the introduction into evidence of the PIP payments, thereby preventing double recovery, could not be enforced in the New York *Cirelli* litigation, whereas it could be in Otero's New Jersey litigation. There is no reason why in the New Jersey litigation the principle against double recovery should be thwarted.[5] Aetna's rights being dependent upon those of Otero, it has no subrogation standing with respect to those PIP payments. Ci-

---

[5] If the statute had omitted sections 9 and 12, then in the absence of a conventional subrogation provision in the agreement between the insured and the insurer, the insurer would probably have had no subrogation rights against the wrongdoer. See *Feaster v. Old Security Life Ins. Co.*, 87 *N.J.Super.* 339 (Law Div.1965), aff'd p. c. o. b., 91 *N.J.Super.* 120 (App.Div.1966); *Courtney v. Harris*, 355 *So.*2d 1039 (La.App.1978); *Michigan Hosp. Service v. Sharpe*, 339 *Mich.* 357, 63 *N.W.*2d 638 (Mich.1954); 3 *Appleman, Insurance Law & Practice*, § 1675 at 495.

relli on the other hand suffered from no such restriction. This is the *sine qua non* of the *Cirelli* rule.[6]

Moreover, significant economic reasons for eliminating subrogation among insurance companies will be advanced in an *Aetna* situation. Fast and efficient reimbursement of the medical expenses of all injured persons, regardless of fault, is assured. Administrative costs, including counsel fees, involved in prosecuting a subrogation claim are saved. Unlike *Cirelli*, where an out of state insurance company would have received the benefit of the statute, such a possibility does not exist in this case. The Legislature unquestionably did not intend that out of state insurance carriers and their nonresident insureds be the beneficiaries of section 12. In the instant case, however, consistent with the intent of the Legislature, only New Jersey residents are the recipients of those benefits. Although denial of reimbursement of PIP benefits to insurers will not directly benefit purchasers of automobile liability policies, it will have some favorable financial impact on those New Jersey consumers who acquire liability policies on both commercial motor vehicles and private automobiles. In view of the overall policy involved, we believe there should be adherence to the plain language of the statute.

The dissent argues that it is inequitable to deny subrogation when the tortfeasor is not covered for the accident by a New Jersey automobile liability policy. The wisdom of the legislative decision which eliminated the injured person's ability to prove and collect PIP damages from a third person is not for us to judge. Section 12 of the Act plainly and clearly has effectively

---

[6]*Marriner v. Koenig*, 148 *N.J.Super.* 363 (Law Div.1977), held that subrogation was permissible where the insured's automobile collided with a train. *Newson v. The Hertz Corporation*, 164 *N.J.Super.* 141 (App.Div.1978), involved a comparable factual setting, a private automobile and truck accident. In both cases the court did not consider the impact of *N.J.S.A.* 39:6A–12, but relied solely on the expiration of the limited "subrogation" right under *N.J.S.A.* 39:6A–9. To the extent these opinions conflict with the opinion herein, they are disapproved.

eliminated that element of damages. According to the dissent, in New Jersey litigation the operative effect of section 12 with respect to the rights of the insurance carrier which paid PIP benefits depends on whether the tortfeasor is covered by a New Jersey automobile liability insurance policy. The language draws no such distinction. In the absence of a clearly expressed legislative intent to the contrary, we regard the language in section 12 as conclusive, irrespective of the nature of the tortfeasor's insurance coverage. The rights of plaintiff's insurance carrier as subrogee cannot exceed those of its insured. Since the injured plaintiff could not recover PIP damages from the tortfeasor, neither could plaintiff's insurance carrier.

When the Legislature desired to modify the impact of having the automobile liability insurance company pay PIP benefits, it has done so in unmistakable fashion. Thus the Legislature has expressly provided that PIP payments shall be reduced by the amount of workers' compensation benefits collectible under the Workers' Compensation Act. *N.J.S.A.* 39:6A–6. In that event, the automobile liability carrier will receive the benefit of workers' compensation because of the express legislative intent.

The arguments marshalled by the dissent should more properly be directed to the Legislature. The Legislature decided injured plaintiffs may not recover PIP payments from the tortfeasor who thereby benefits from a collateral source. It is not for us to rewrite the statute to comport with our judgment of what we may consider to be a wiser course. *State v. Fearick*, 69 *N.J.* 32, 37 (1976).

Some confusion has arisen because of *N.J.S.A.* 39:6A–9. That section created a statutory right of "subrogation" by providing that an insurer paying PIP benefits "shall be subrogated to the rights of any party to whom it makes such payments, to the extent of such payments." However, the right was a limited one. It could be exercised only against the insurer of the tortfeasor, and then processed, as we have previously indicated,

only through intercompany arbitration or agreement. The provisions of the section became inoperative after December 31, 1974. *Penna. Manu. Assoc. Ins. Co. v. Gov't Emp. Ins. Co.*, 72 *N.J.* 348 (1977). After that date, an insurer's right to "subrogation," if any, would be the same as prior to its enactment.

However, *N.J.S.A.* 39:6A–9 must be considered with *N.J.S.A.* 39:6A–12, which effectively eliminates the rights of the insured against the tortfeasor. When so viewed, it can be seen that the purpose of *N.J.S.A.* 39:6A–9 was to create a limited right of recovery by the insurer paying PIP benefits until December 31, 1974, despite the fact its insured could not otherwise recover the amount of PIP benefits from the tortfeasor. Though section 9 uses the word "subrogation," in fact the right created therein was not one of "subrogation" because the insurer's right to recover was not derived from the insured. The right did not arise by operation of a provision in the contract of insurance. The insurer did not stand in the shoes of the insured, but was able to obtain recovery of PIP payments only because of section 9.

In this case Otero could not maintain an action for the amounts paid under the PIP provisions of his automobile insurance policy. These are the benefits which Aetna seeks to recover because of its agreement with Otero providing for subrogation. Since the named insured had no right to which Aetna could be subrogated, its claim must be denied.

The judgment of the Appellant Division is modified and, as modified, is affirmed.

SULLIVAN, J., dissenting.

While I concur in parts I and II of the majority opinion, I disagree with the majority's conclusion in part III, that subrogation law bars Aetna's claim in this case. Since I am convinced that today's ruling will result in private automobile owners "subsidizing" the cost of insurance on non-PIP-covered commercial vehicles in this State, and since such a result is unreasonable

and inequitable on its face and clearly conflicts with the purposes of the No Fault Act,[1] I respectfully dissent.

Under today's ruling the tortfeasor is given immunity from liability for the PIP damages he caused and Aetna's right to reimbursement for PIP obligations incurred is limited to requests for rate increases from the Department of Insurance. In essence, the PIP insurer's own customers will ultimately pay, through higher PIP premiums, for tortious conduct by operators of commercial vehicles.[2] Commercial insurers, on the other hand, are not subject to the provisions of the No Fault Act and, thus, suffer from no similar restriction on their right to sue private automobile operators and their PIP insurers for PIP-type expenses paid to their commercial insureds. They enjoy reimbursement and subrogation rights under our workers' compensation statute. *N.J.S.A.* 34:15-40(a), (b), (f). As a result, workers' compensation carriers are free to recover for benefits paid their insureds as a result of negligence by private automobile operators, and thus, are able to avoid unwarranted increases in the liability rates of their insureds. This imbalance in the subrogation rights of insurance carrier will necessarily result in higher liability insurance premiums for private automobile own-

---

[1] One obvious goal of the No Fault legislation was to effect a *reduction* in private automobile insurance rates in this State. *See Iavicoli, No Fault & Comparative Negligence in New Jersey* (1973), at 205–206, 207–208 (excerpts from Automobile Insurance Study Commission Report to the Governor and the Legislature, December 1971).

[2] Henceforth, PIP insurers are barred from suing any party for PIP costs incurred, regardless of whether the tortfeasor is (1) a commercial trucker not subject to the No Fault Act; (2) an out-of-state driver not subject to the No Fault Act who negligently causes an accident with a No Fault insured in New Jersey; (3) a person who by law is required to carry No Fault coverage but who culpably failed to obtain the coverage; or (4) a person who does not own an automobile but who causes an automobile accident, *i. e.*, by throwing a brick through a No Fault insured's windshield. In each of these hypothetical instances, the cost of PIP benefits paid by PIP carriers will be borne by the carrier's insureds instead of the individuals responsible for the injury who, in good conscience, ought to pay them.

ers in this State with a corresponding windfall for commercial vehicle owners.

In *Cirelli v. Ohio Casualty Ins. Co.*, 72 *N.J.* 380 (1977), we considered whether the No Fault Act placed any limitation upon a New Jersey No Fault insurer's contractual subrogation rights, where the accident in question occurred in New York and involved a New York tortfeasor. In ruling that the subrogation provisions of the No Fault Act were inapplicable, we held that

> where the accident occurs outside New Jersey and a New Jersey and an out of state vehicle are involved, the predicate for the PIP provisions preventing subrogation does not exist. Elimination of subrogation rights among New Jersey carriers may operate to reduce premium costs because of reduced administrative expenses, including counsel fees. This factor may be absent when an out of state insurance carrier is involved. The shifting of dollars among New Jersey and out of state carriers may be an element in fixing the cost of automobile liability policies in New Jersey. *If insurers of New Jersey vehicles are deprived of subrogation rights, liability carriers in foreign jurisdictions may reap an unjustifiable benefit. In other words the New Jersey insurance company could not collect from the New York tortfeasor or his insurance carrier. Those out of state insurance companies in turn may not be subject to such deprivation in favor of the New Jersey carrier. The Legislature certainly did not intend that New Jersey residents should subsidize residents of other jurisdictions.* [*Id.* at 387–388; emphasis added]

This same rationale is equally applicable in the case *sub judice.* The Legislature no more intended that private automobile owners should subsidize commercial vehicle owners in this State than it intended that New Jersey residents subsidize New York automobile owners.

A more reasonable interpretation of the No Fault Act, first, recognizes *N.J.S.A.* 39:6A–12 as an evidentiary exclusionary rule only, having no effect on the subrogation rights of PIP insurers. The majority's analysis, which utilizes the plain language of *N.J.S.A.* 39:6A–12 and strict enforcement of traditional principles of subrogation law to deny plaintiff's subrogation claim, overlooks the unique circumstances posed by the No Fault Act's applicability in this case. The equitable principles of subrogation law cannot be routinely applied in a situation where the Legislature has dramatically altered the contractual rights and liabilities of the parties to an insurance contract. Moreover, it is

axiomatic that a court will not strictly enforce equitable doctrines where to do so would lead to an unjust result. See *Midland Bank & Trust Co. v. Fidelity & Deposit Co. of Md.*, 442 *F.Supp.* 960, 973 (D.N.J.1977); *Fidelity & Cas. Co. of New York v. First Nat'l Bank in Fort Lee*, 397 *F.Supp.* 587, 589 (D.N.J. 1975), app. dism., 538 *F.2d* 319 (3d Cir. 1976).

Second, I read *N.J.S.A.* 39:6A–9 as eliminating, as of January 1, 1975, all subrogation rights of PIP insurers for PIP obligations incurred, but only where all the insurance carriers involved in a given dispute are subject to the requirements of the No Fault Act.[3] Only when all vehicles involved in an accident are PIP-covered is the policy behind the Act's subrogation bar served (the elimination of cumbersome and uneconomic shifting of dollars from one insurance company to another) because only in this instance do all insurance carriers involved stand on equal footing.[4] Under this interpretation of *N.J.S.A.* 39:6A–12 and 39:6A–9, in cases where section 9's subrogation bar would be inapplicable, the contractual subrogation rights of the PIP carrier would be fully recognized.

The majority asserts that "significant economic reasons" justify the denial of subrogation rights here. It points out, first, that today's ruling guarantees the fast and efficient reimbursement of medical expenses of all injured persons, regardless of fault. Second, it states that administrative costs and counsel

---

[3]As of January 1, 1975, PIP insurers' subrogation rights were replaced by a rate setting system, supervised by the Department of Insurance, designed to "reimburse" each insurer for its PIP costs. *Pa. Mfrs. Assn. Ins. Co. v. Gov't Emp. Ins. Co.*, 136 *N.J.Super.* 491, 498–499 (App.Div.1975), aff'd o.b., 72 *N.J.* 348 (1977); *Cirelli v. Ohio Casualty Insurance Co.*, 133 *N.J.Super.* 492, 498 (Law Div.1975), aff'd as mod., 72 *N.J.* 380 (1977); *Iavicoli, supra*, at 117.

[4]We acknowledged the validity of this construction of *N.J.S.A.* 39:6A–9 in *Cirelli* where we held that the elimination of subrogation rights under the Act "contemplated situations where New Jersey vehicles (those registered or principally garaged in this State, *N.J.S.A.* 39:6A–3) were involved and the insurance policies related to those vehicles were subject to the requirements of the No Fault Law." 72 *N.J.* at 386–387.

fees will be saved as a result of the decrease in litigation. Finally, while the majority concedes that its ruling will not benefit the vast majority of New Jersey residents who own only private passenger vehicles, it claims the ruling will have some, unstated, "favorable financial impact" on those New Jersey consumers who own and insure *both* commercial and private passenger motor vehicles. I am not persuaded that any of these claimed "economic reasons" justify the result reached in this case.

Initially, I note that the fast and efficient reimbursement of medical expenses, guaranteed by *N.J.S.A.* 39:6A–5, is assured regardless of our holding as to Aetna's subrogation claim. Second, while the recognition of subrogation rights under these facts would increase the administrative costs, including counsel fees, of PIP carriers, these costs would undoubtedly be more than offset by the recovery of PIP expenses from those ultimately responsible for the underlying personal injuries (non-PIP carriers and their insureds). Finally, the only "favorable financial impact" that I foresee accruing to the few New Jersey residents who own both commercial and private passenger vehicles will be lower liability rates for their commercial coverage. As heretofore noted, commercial vehicle owners as a class necessarily enjoy a windfall under today's ruling. PIP premiums on all private passenger vehicles, however, including those owned by commercial vehicle owners, will undoubtedly rise as a result of the imbalance in subrogation rights that, henceforth, will exist between commercial and private passenger vehicle carriers.

Furthermore, the majority apparently believes that the primary goal of *N.J.S.A.* 39:6A–12, barring an insured from introducing in any civil action evidence of PIP-covered expenses, was to prevent double recovery by insureds for PIP damages. In attempting to distinguish the ruling in *Cirelli*, the majority notes that "[t]here is no reason why in New Jersey litigation the principle against double recovery should be thwarted." 85 N.J. at 564. This perception of the primary purpose of section 12 is incorrect and the majority's concern that the principle against double

recovery would be thwarted were we to uphold Aetna's right to subrogation in this case is unjustified.

First, as *Iavicoli* points out, the "principal reason" for the passage of section 12 was to deter plaintiffs from seeking unneeded medical treatment and thereby inflating medical expenses in hopes of currying jury sympathy at trial. *Iavicoli, supra* at 90. If in drafting section 12, the Legislature merely intended to preclude double recovery by insureds for PIP damages, it would not have constructed such an elaborate evidentiary rule. A provision stating that an insured shall hold in trust for his insurer any PIP-type damages recovered in an action against a tortfeasor would have been sufficient. A recognition of the unique *evidentiary* purpose underlying the passage of section 12 reinforces the conclusion that it was intended only to affect the admissibility of evidence in suits brought by insureds—it was not intended to affect the subrogation rights of PIP insurers. Moreover, interpreting section 12 as having no effect on the subrogation rights of PIP insurers would in no way "thwart" the principle against double recovery. Under my interpretation of the Act, section 12 would continue to bar insureds from introducing evidence of PIP-covered expenses in any civil action. Section 9, meanwhile, would allow PIP insurers to assert contractual subrogation rights against non-PIP-insured tortfeasors.

Since the accident at the heart of the instant case involved a PIP-covered automobile and a non-PIP-covered commercial vehicle, I would hold the subrogation provisions of the No Fault Act inapplicable. Consequently, the subrogation rights reserved to Aetna in its contract with its insured should be held fully enforceable. Accordingly, I would reverse the Appellate Division and remand the matter to permit Aetna to assert its subrogation claim.

PASHMAN, J., concurring and dissenting in part.

I agree with the majority that Aetna's suit was properly dismissed on the ground that, in light of *N.J.S.A.* 39:6A–12, there

was no claim to which Aetna could be subrogated. Although this ground alone would support its decision, the majority has nevertheless addressed the general question whether the single controversy doctrine is applicable in the context of subrogation. Because I believe that the majority has incorrectly treated this issue, I write separately to express my disagreement with the majority on that subject.

I would hold that the single controversy doctrine is available as a defense against a subrogation claim after a settlement between the insured and the tortfeasor, unless the tortfeasor knew about the existence of the subrogation claim at the time of the settlement. Because I would find that defendant in this case was chargeable with such knowledge, I agree with the majority's conclusion that the single controversy doctrine would not bar Aetna from maintaining its suit, assuming that the No-Fault Act had not eliminated Aetna's right to subrogation.

Contrary to the belief of the majority, the single controversy doctrine is directly relevant to the law of subrogation and bars any action by an insurer-subrogee on its subrogation claim after its insured has settled with the tortfeasor. The doctrine applies because the rights of a subrogated insurer rise no higher than the rights of its insured against the third party—a principle recognized by the majority, *ante* at 561. Consequently, a subrogee is subject to all the legal and equitable defenses that the third party enjoys against the subrogor. *Standard Accident Insurance Co. v. Pellecchia*, 15 *N.J.* 162, 172–73 (1954). After a settlement with the insured, the third party obviously could raise the single controversy doctrine as a defense against a subsequent action brought by the insured arising from the same accident, since dismissal of an action pursuant to a settlement operates as a judgment for the purposes of *res judicata. See Kelleher v. Lozzi*, 7 *N.J.* 17, 26 (1951). Therefore, the third party can also raise the defense against an action brought by the insurer to enforce its subrogation rights. *See* 6A Appleman, *Insurance Law and Practice* § 4092 at 239–40 (1972) (citing cases).

The majority reasons that the single controversy doctrine is not a bar in the context of this case because the doctrine does not require joinder of parties. *Ante* at 557–59. But this principle, even if valid, is not relevant here. The question is not whether the insured must join the insurer in its action as a party plaintiff, but whether the insurer must intervene in the action, or at least give notice to the tortfeasor of the existence of its subrogation claim, in order to avoid the merger of its claim in any judgment or settlement obtained in the insured's action. In my opinion, such intervention or notice by the insurer is necessary to preserve its claim as the subrogee.

The majority's reliance on *McFadden v. Turner*, 159 *N.J.Super.* 360 (App.Div.1978), is misplaced. In *McFadden*, where the issue did involve failure to join parties, the court held that the single controversy doctrine does not prevent a plaintiff from electing to litigate successively against two defendants liable on the same claim. The court correctly observed that the doctrine is based on the principle that "litigants in an action should not be required, after final judgment therein is entered, 'to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or series of transactions.'" *Id.* at 369–70. The plaintiff's action in *McFadden* did not implicate this principle, because a single defendant was not compelled to litigate successively claims arising from the same transaction. In contrast, the policy underlying the single controversy doctrine is relevant in the present case. The defendant here would be required to engage in multiple litigation to resolve claims arising from a single accident in favor of a single plaintiff or of parties, like Aetna, whose interests derive from that plaintiff.

The majority indicates that even if a procedural rule requiring a subrogee to intervene in an action by its insured were appropriate, it would be unfair to apply the rule in this case because our procedural rules have not previously required such intervention. *Ante* at 559–60. This statement overlooks the fact that no such procedural rule is necessary, since well-established princi-

ples of *res judicata* already require a subrogee to take action to protect its interests as a matter of substantive law. *See, e. g., Story v. Rivers,* 220 *Ga.* 232, 138 *S.E.*2d 304 (1964); *Travelers Insurance Co. v. Hartford Accident & Indemnity Co.,* 222 *Pa.Super.* 546, 294 *A.*2d 913 (1972); *United Services Automobile Association v. Hartford Accident & Indemnity Co.,* 220 *Tenn.* 120, 414 *S.W.*2d 836 (1967); *Southern Pacific Transport Co. v. State Farm Mutual Insurance Co.,* 480 *S.W.*2d 59 (Tex.Civ.App. 1972); *State Farm Mutual Automobile Insurance Co. v. De Wees,* 143 *W.Va.* 75, 101 *S.E.*2d 273 (1957); 6A Appleman, *supra,* § 4092 at 239–40.

The majority also suggests that any rule requiring a subrogee to intervene would be inapplicable where, as here, the insured has settled instead of proceeding to judgment. *Ante* at 559–560. This suggestion disregards the principle, stated above, *supra* at 573, that a settlement is treated as the equivalent of a judgment for purposes of *res judicata,* including the single controversy doctrine. *See Kelleher v. Lozzi, supra.*

Although a settlement between an insured party and a tortfeasor will normally bar maintenance of an action to enforce subrogation rights, this rule should not apply to cases where the tortfeasor has actual knowledge or is chargeable with knowledge of the subrogated claim at the time of the settlement. *See, e. g., Melick v. Stanley,* 174 *N.J.Super.* 271 (Law Div.1980); *Sentry Insurance Co. v. Stuart,* 439 *S.W.*2d 797 (Ark.1969); *Home Insurance Co. v. Hertz Corp.,* 71 *Ill.*2d 210, 16 *Ill.Dec.* 484, 375 *N.E.*2d 115 (1978); *Travelers Indemnity Co. v. Vaccari,* 310 *Minn.* 97, 245 *N.W.*2d 844 (1976); *State Farm Mutual Insurance Co. v. Farmer's Insurance Exchange,* 27 *Utah* 2d 166, 493 *P.*2d 1002 (1972); *Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange,* 4 *Wash.App.* 49, 480 *P.*2d 226 (1971). In those circumstances, a general release would constitute "such a fraud upon the subrogee as will avoid it both at law and in equity so far as it affects the rights of the subrogee." *Standard Accident Insurance Co. v. Pellecchia, supra,* 15 *N.J.* at

175, quoting *Fire Association of Philadelphia v. Wells*, 84 *N.J.Eq.* 484, 486 (E & A 1915).

In this case, if payment of PIP benefits did give rise to subrogation rights, defendant would be chargeable with knowledge of Aetna's subrogation claim since every New Jersey motorist must carry automobile insurance and the standard policy must include PIP coverage. *N.J.S.A.* 39:6A–3 and –4. Because of such knowledge, defendant would be deemed to have waived its single controversy defense when it entered the settlement agreement without the participation of the subrogee. But, as the Court holds today, payment of PIP benefits does not create a right of subrogation. Therefore, the trial court correctly dismissed Aetna's claim, regardless of defendant's waiver of its rights under the single controversy doctrine.

I concur in the opinion of the majority except for the discussion of the single controversy doctrine in part I of that opinion.

PASHMAN, J., concurring in the result.

*For modification and affirmance*—Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—5.

*For reversal and remandment*—Justice SULLIVAN—1.