In the Matter of REACH, McCLINTON AND CO., INC., and L. Andrew Bernheim, Debtors.

L. Andrew BERNHEIM, Individually and On Behalf of Himself and any other Person Similarly Situated, and Reach, McClinton and Co., Inc., a New Jersey Corporation, Plaintiffs–Appellants,

v.

J.H. COHN & Co., Benjamin Alpert, June Alpert, Louis Rones, Howard J. Schlumpf, Miles Sachs, and the Estate of Robert Rocker, Defendants–Appellees.

Civ. A. No. 88–5111 (JCL).

United States District Court, D. New Jersey.

June 8, 1989.

Michael R. Perle, Hayden, Perle & Silber, Hoboken, N.J., for plaintiffs-appellants.

Stephen N. Dratch, Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Fransblau & Falkin, P.A., Roseland, N.J., for defendants-appellees.

## OPINION

LIFLAND, District Judge.

Plaintiffs-appellants are appealing from the order of the bankruptcy court entered on July 27, 1988 dismissing the amended complaint of the plaintiffs-appellants and entering judgment in favor of the defendants-appellees in this adversary proceeding. The court has reviewed the record and the arguments raised by the parties on appeal. For the reasons set forth below, the court affirms the decision of the bankruptcy court.

### Background

Plaintiff Reach, McClinton & Co. [hereinafter "Reach"], a company controlled by plaintiff Bernheim, was a client of the accounting firm of defendant J.H. Cohn & Co. [hereinafter "J.H. Cohn"] from 1959 to approximately 1981. J.H. Cohn also represented Bernheim, Bernheim's siblings, and other Bernheim entities. The individual defendants are accountants in J.H. Cohn, except for defendant June Alpert, who is the wife of Benjamin Alpert. J.H. Cohn is the largest independent public accounting firm in New Jersey. Bernheim's father, Daniel Bernheim, was the principal officer, director, manager, and majority stockholder of Reach from the early 1960s through his death on September 10, 1977. The most valuable asset of Reach during this period was a stock interest in Rancho La Costa, Inc. [hereinafter "Rancho"], a corporation created to develop a resort hotel on a tract of land north of San Diego, California.

J.H. Cohn acted as Reach's accountant throughout Reach's Chapter 11 proceeding which commenced in November 1971.

Daniel Bernheim died after Reach emerged from these proceedings but before Reach's obligations were fully paid. Following his father's death, Bernheim sought to gain control of Reach and exclude Reach's creditors. Accordingly, he assumed his father's obligations and merged Reach with Reach for the Sky, Inc., a newly-formed corporation that he controlled.

Plaintiffs argued at trial that the defendants entered into schemes against plaintiffs and breached their contractual obligations to plaintiffs. The relevant facts from the record are summarized as follows:

(1) The accountants responsible for the Reach and Bernheim accounts at J.H. Cohn issued statements stating that Reach had an unqualified ownership of 400 shares of Rancho when in fact defendants Benjamin Alpert and Rones had a beneficial interest in 50 of those shares pursuant to arrangements made with Daniel Bernheim in the 1960s. At trial the defendants stated that during the time in question the stock was worthless and that from an accounting standpoint J.H. Cohn's failure to mention Alpert's and Rones' beneficial ownership in the 50 shares was not improper. In addition, Alpert testified that he as well as Rones did not want to be publicly linked to the developers of Rancho for professional reasons.

(2) J.H. Cohn and the individual accountants did not report the beneficial holdings of Alpert and Rones throughout the 1970s during Reach's Chapter 11 proceedings and Bernheim's efforts to gain complete control of Reach and its assets. Alpert and Rones asserted their beneficial interests in the 50 shares shortly before the shareholder approval of a tax-motivated plan, devised by Alpert, whereby a Canadian corporation, Daon, purchased a large part of the Rancho real estate holdings. This plan involved liquidating Rancho as a corporation, paying to its shareholders the proceeds of the Daon sale through a liquidating dividend, and selling the remaining assets of Rancho to a newly-created partnership in which interests were offered to the Rancho shareholders in proportion to their prior stock ownership in Rancho. The plan netted over $58,000,000 to Rancho.

(3) Bernheim directed that Rancho send all of Reach's portion of the liquidating dividend to Reach. Thereafter, on March 20, 1981 Alpert and Rones filed suit in New Jersey state court in an action entitled *Benjamin Alpert and Louis Rones v. Andrew Bernheim and Reach, McClinton Co., Inc.*, Docket No. C–2573–809, and sought injunctive relief reflecting their ownership of the 50 shares of Rancho in question and their proportional ownership of the proceeds and partnership interests. On the same day, J.H. Cohn filed suit in New Jersey state court in an action entitled *J.H. Cohn & Co. v. L. Andrew Bernheim and Adelyn Firtel, individually and as co-executors of the Estate of Daniel M. Bernheim and the Estate of Frances R. Bernheim, Reach, McClinton Co., Pharmadyne Laboratories Inc., Robert Firtel, and Bernheim Importers, Inc.*, Docket No. C–2574–8. The latter action asserted claims to book accounts showing accounting fees aggregating $138,737.

(4) Plaintiffs in the action brought by Alpert and Rones obtained an Order to Show Cause dated March 24, 1981. At the hearing on that same date, Stephen S. Radin, counsel for the defendants in both actions, stated, *inter alia:*

MR. RADIN: This is a long history. Apparently in 1966 Mr. Alpert, as indicated in ... his papers, and assuming it is true as set forth in the papers, we had not had the opportunity to contradict it, but let's assume it is true, Your Honor, that he gave $50,000 to Daniel Bernheim and said to Bernheim to invest that money in some of the LaCosta stock and he would be an undisclosed principal. Alpert is an attorney and he is also a senior partner in J.H. Cohn. He invests with his client and becomes an undisclosed principal.

From 1966 to 1980 J.H. Cohn does the books of Reach, McClinton and does certified statements of Reach, McClinton and never in any of the statements of Reach, McClinton indicates that any of the LaCosta stock which is owned by Reach, McClinton is in fact 50 shares owned [by] Ben

Alpert. There's never any indication in any of the accounting work that J.H. Cohn does that Alpert is the owner. In fact, he doesn't do anything about it in LaCosta either, Your Honor, where I understand he is also a tax advisor and renders services to LaCosta. So he never changes the records to reflect that he has 50 shares nor does he ever receive anything from Daniel Bernheim at the time he is alive to indicate that, yes, in fact he is the owner of 50 shares of stock. As the years go by Reach, McClinton goes into bankruptcy. They file a Chapter 11 petition. What happens there is J.H. Cohn is then the accountants in the bankruptcy petition. There is no filing at any time, no claim made against the estate that Ben Alpert owns 50 shares of one of the assets of Reach, McClinton. During the time of the bankruptcy Andrew Bernheim from his own personal funds puts in significant amounts of money to pay the creditors according to the plan so he can take the Reach, McClinton Company out of Chapter 11; and in fact he does that and he does that on the basis that he wants to protect the assets of Reach, McClinton. Reach, McClinton has certain assets in addition to LaCosta stock, it has a radio station and I believe there are other assets which they own. Bernheim, recognizing that may be a valuable asset, puts his own personal funds to take out Reach, McClinton from Chapter 11. There is never any indication from Alpert or Rones that they own 50 shares of that LaCosta stock during the time Bernheim is paying to make sure that Reach, McClinton comes out of the Chapter 11.

Now, in 1977 Daniel Bernheim dies. J.H. Cohn is the accountant for him. There is never a claim by Mr. Rones or Mr. Alpert that they own 50 shares of this stock. There is no claim against the estate and there is no claim anywhere. In fact, there is a Court-ordered inventory in Somerset County which lists the assets of the estate and the assets of the estate are, one, Reach, McClinton and Reach, McClinton's value. And at that time of the date of death apparently the stock of LaCosta was not worth anything, according to J.H. Cohn, because of some moratorium on building there. But J.H. Cohn goes ahead and in their inventory to the Court sets forth Reach, McClinton, Your Honor, and one of the assets of Reach, McClinton is 400 shares of stock owned by Reach, McClinton in LaCosta. And never at that point indicating that Ben Alpert is a stockholder of that company. So Ben Alpert is fully aware at all times of all the financial transaction between the Bernheims. He keeps all the books and records through J.H. Cohn. And never once in 15 years does he raise the issue that he is entitled to 50 shares of stock. And he is also a tax advisor to LaCosta. And he never moves anywhere to make himself title owner.

What happens, Your Honor, in October of 1980 there's a sale and Alpert all of a sudden recognizes that those particular shares may have some value and then begins to say to Andrew Bernheim for the first time, Mr. Bernheim tells me, for the first time, and there's no written record to indicate otherwise, that he is the owner of 50 shares and that he wants the stock certificates transfered on the books of LaCosta.

THE COURT: How about Mr. Rones?

MR. RADIN: Never heard from Rones. I think Rones is just Alpert's partner and he is an undisclosed … principal. I recognized last week when Alpert told me that Rones was his partner in this. But I believe that Alpert and Rones are one and Rones came in as the silent partner of Alpert.

So there is no effort by Alpert at any time to do anything. . . .

(5) On April 15, 1981 the parties settled the *J.H. Cohn* case in the midst of a deposition of Howard Schlumpf concerning the *J.H. Cohn* case:

MR. RADIN: It would appear that the parties have reached an amicable settlement in this matter in that L. Andrew Bernheim will take out of the funds that are deposited [to wit, the Rancho liquidating dividend] the sum of $85,000 and pay those funds to J.H. Cohn and Company. That $85,000 will be paid for all of the claim and services rendered to the Bern-

heim family that's the subject matter of the litigation, other than the item that's allegedly due J.H. Cohn by Robert and Adelyn Firtel [Bernheim's brother-in-law and sister] in the amount of $3,385.00.

This sum of $85,000 will be for all services that have been rendered by J.H. Cohn up to date.

MR. SACHS: Through April 15, 1981.

MR. RADIN: J.H. Cohn further agrees to perform the following services for Mr. Bernheim which shall include:

A. L. Andrew Bernheim's personal tax return for 1979 and 1980.

B. Antony Paul Bernheim's 1980 tax return.

C. Certified financial statements for R.B.G. Productions, Inc., and subsidiary for the year June 30, 1980 and June 30, 1981.

D. To complete the federal tax examination at the agent's level of the estate of Daniel Bernheim.

For the terms set forth above, L. Andrew Bernheim agrees to pay J.H. Cohn & Company the sum of $19,000 on August 3, 1981, whether or not the work on the aforesaid items are completed or not.

This settlement will be entered into on a Court order which shall provide that J.H. Cohn will release its claims against L. Andrew Bernheim and the other defendants in this matter, except that the claim against Robert Firtel will be dismissed in this case without prejudice for J.H. Cohn to bring another action against Mr. Firtel if necessary for the accounting fees due and owing to J.H. Cohn & Company.

It is further agreed that in the event that Mr. Bernheim does not pay the sum of $19,000 on August 3, 1981, a judgment will be entered against him without any defense except payment.

MR. DRATCH: I just want to put on the record that this settlement is made in the presence of Myles J. Sachs on behalf of J.H. Cohn & Company and L. Andrew Bernheim who were present in the room while this has been recited into the record.

Bernheim apparently changed his mind regarding the settlement and refused to pay in the *J.H. Cohn* case. Plaintiffs brought a motion to enter judgment enforcing the terms of the settlement and for other relief, which was granted in an order dated June 1, 1981.

(6) The parties entered into a written settlement agreement in the *Alpert and Rones* case on June 11, 1981. Alpert and Rones were to receive an aggregate of $397,500 for their proportional share of the Rancho dividend. In return Alpert and Rones forfeited any claims or interests in Rancho. The case was dismissed by consent order on July 17, 1981.

(7) J.H. Cohn did not complete some of the tasks required pursuant to the settlement agreement in the *J.H. Cohn* case. The testimony indicated, however, that Bernheim failed to timely pay the $19,000 that he was obligated to pay pursuant to this agreement, that Bernheim refused to turn over information to J.H. Cohn so that they could perform these services, and that J.H. Cohn eventually did extra work for Bernheim for which Bernheim refused to pay.

(8) Pursuant to Rancho's partnership plan described above, Reach was offered a share in the partnership commensurate to its previous stock ownership. However, Alpert had privately advised Bernheim's younger brother Tony to seek independent counsel. The concern was that Bernheim planned to control the entire liquidating dividend distribution, including Tony's share, and had also committed other improprieties. Tony and Adelyn Firtel filed suit against Bernheim, obtained an injunction against a disbursement of funds to Bernheim, and froze the funds necessary for Bernheim to purchase, through Reach, the Rancho partnership share. Subsequently Alpert was offered a 1% interest in the partnership which he purchased in August 1982 in his wife's name. This investment yielded Alpert substantial profits. It was disputed whether Alpert's subsequent purchase was causally related to Reach's exclusion.

Plaintiffs filed this suit in bankruptcy court on December 19, 1985. The amended complaint, which was filed May 19, 1986, sets

forth eight counts. Counts One and Two are brought under the Racketeer Influenced and Corrupt Organizations Act ["RICO"], 18 U.S.C. § 1961 *et seq.* Count One names Alpert, Rones, Schlumpf, Sachs, Rocker and J.H. Cohn as defendants and asserted that these defendants acquired or maintained an interest in an enterprise, Rancho La Costa, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b). Count Two names the individual defendants and alleged that they participated in the affairs of a racketeering enterprise through a pattern in violation of 18 U.S.C. § 1962(c). Counts Three through Seven allege fraud, misrepresentation, breach of fiduciary duty, professional malpractice, and negligence. Count Eight sets forth a claim for breach of contract. Plaintiffs sought injunctive relief, damages, and costs.

The court denied defendants' motion for partial summary judgment in an order dated October 27, 1986 and held a bench trial on January 21, 22, 28, 29, March 30, and June 9, 1988. On June 29, 1988 the court granted summary judgment to defendants at the conclusion of plaintiffs' case. The court changed the reasoning it had set forth in denying partial summary judgment and found that although plaintiffs had set forth a *prima facie* case as to Counts Three through Seven as to matters leading up to the 1981 settlements, New Jersey's "entire controversy" doctrine precluded these counts. In addition, the court found that plaintiffs had not set forth a *prima facie* case with respect to Counts One, Two, and Eight, and with respect to the other counts as to matters following the 1981 settlements. Accordingly, the bankruptcy court entered an order dismissing the case on June 29, 1988. Plaintiffs appealed to this court pursuant .to F.R. Bankr.P. 8001 *et seq.*

## Discussion

■ Bankruptcy Rule 8013 states:

On an appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

The court must apply the "clearly erroneous" standard to the bankruptcy court's findings of fact; the bankruptcy court's conclusions of law, however, are subject to plenary review by this court. *See, e.g., In re Longardner & Associates, Inc.,* 855 F.2d 455, 459 (7th Cir.1988); *Matter of Dunes Casino Hotel,* 63 B.R. 939 (D.N.J. 1986).

Plaintiffs raise three issues on appeal:

1. Based on the "entire controversy doctrine," were all claims of plaintiffs against all defendants, including· defendants Schlumpf, Rocker and Sachs, who were not parties in prior actions in the Superior Court ·of New Jersey, Chancery Division, precluded to the extent they were based on events prior to the conclusion of the Superior Court actions?

2. Did the actions of Benjamin Alpert (subsequent to the settlements of the Superior Court actions, at a time when L. Andrew Bernheim and Reach, McClinton & Co. remained clients of J.H. Cohn & Co.) in advising Adelyn Firtel and Anthony Bernheim to consider taking action with regard to receipt by L. Andrew Bernheim and/or Reach, McClinton & Co. of moneys being distributed from the dissolution of Rancho La Costa, Inc. constitute: (a) "racketeering activity" within the contemplation of 18 U.S.C. § 1961(1); (b) common law breach of fiduciary duty; (c) common law tortious interference; (d) professional malpractice; (e) negligence; or (f) otherwise actionable tortious conduct?

3. Assuming either (1) that the actions of Alpert together with actions of other defendants acting on behalf of defendant J.H. Cohn & Co. after July of 1981, or (2) that the earlier activities of defendants, or such of the defendants as to whom claims were not precluded, constituted "racketeering activity," did the combination of the earlier scheme and the later scheme, or the earlier scheme alone, constitute a "pattern of racketeering activity" and a violation of

§ 1962, from which plaintiffs suffered loss actionable under 18 U.S.C. § 1964(c)?

In addition, each party has argued that sanctions should be entered against the opposing party.

### A. The Issues Raised on Appeal Regarding RICO

The bankruptcy court dismissed the first two counts of the amended complaint on the ground that the evidence presented by the plaintiff did not establish a cause of action under RICO, which are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). *Sedima* held that a private action under 18 U.S.C. § 1964(c) may lie whether or not a defendant has been convicted of a predicate act or RICO violation. Section 1964(c) states: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1962 has four subsections, each of which deems unlawful the use of, or a conspiracy to use, income for racketeering through the use of an enterprise engaged in interstate or foreign commerce.

The Supreme Court has noted that the "pattern" requirement for RICO, while not clearly defined, is not satisfied merely by setting forth two incidents:

> The legislative history supports the view that two isolated acts of racketeering do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969).

*Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (emphasis in original). In *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36 (3d Cir.1987), the Third Circuit addressed the critical phrase "continuity plus relationship" in interpreting whether a pattern of racketeering activity was properly alleged in a complaint. The Third Circuit rejected the notion that a RICO pattern must involve at least two distinct unlawful schemes, preferring to confront the meaning of "pattern" directly and noting that such a notion might result in consequences "plainly inconsistent with the purposes of the statute." *Id.* at 39. Also rejected was the notion that "racketeering acts committed pursuant to a single scheme can constitute a RICO pattern only if the scheme is potentially ongoing or open-ended," since that would preclude an action against a completed scheme. *Id.* The Third Circuit concluded that the legislative history's reference to "continuity" merely called for an inquiry into the extent of the activity, and whether unlawful activity was sufficiently extensive to be continuous "depends on the circumstances of the particular case." *Id.* at 40.

The factors relevant to the case-by-case analysis called for in *Barticheck* include: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. *Id.* at 39 (citing *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1355 (3d Cir. 1987)); *accord, Marshall–Silver Constr. Co., Inc. v. Mendel,* 835 F.2d 63, 66 (3d Cir.1987).

Appellants argued that they had established a *prima facie* RICO case. Appellants asserted that "in terms of pattern, in terms of continuity, we have a relationship which goes back to 1958, and at least through 1961, and certainly through the '70s, which reveals ... a pattern of blatant conflict of interest, of failure to disclose...." Tr. of June 29, 1988 at 23. The court noted that Alpert "was not a very nice man, but we're dealing now with whether or not he violated the RICO statute, and I don't care whether he's a nice man or not." *Id.* at 24. The bankruptcy

court questioned whether Alpert, in speaking with Tony Bernheim, intended to hurt Andrew Bernheim:

> I have been looking and listening very hard for what is really [counsel for Bernheim's] conclusion when he says that the act of telling Tony to stop Andy is a necessary predicate for *Sedima.* First of all, Tony didn't say that Alpert said, "Stop Andy." He said, "You've got to do something about it. You've got to exercise your rights." And so Tony, knowing all these things from '78, '79, and '80, consulted with independent counsel, brought an action, and the adjudication of that action wasn't that Alpert committed a fraud, but that Andy was misusing funds....
>
> It seems to me that RICO was never intended to be used, or civil RICO was never intended to be used to prevent someone to encourage another to exercise his legal rights in a court of law....
>
> If the gravamen of Count One is that that act was part of a pattern, that is on its face untenable....
>
> And it seems to me that that essential element of a pattern of racketeering as defined in *Sedima,* as alluded to in note 14, as determined by the other cases cited by [counsel for Bernheim]—all of which I have looked at, all of which I have read—simply does not rise to the level of civil RICO. And in consequence of that, I find as a matter of fact that the plaintiff has failed to make out a *prima facie* case of a violation of civil RICO.

Tr. of June 29, 1988 at 26–28. The bankruptcy court also rejected appellants' argument that Alpert's actions breached Alpert's fiduciary duty to Bernheim:

> If Ben Alpert has been functioning as an attorney in this case, I would have— many months ago—turned over the evidence in this case to the Office of Attorney Ethics. I think he violated every rule of conflict of interest that I can think of it would be possible to violate in this particular situation. However, I must rule on the facts. I still don't see, even if there is the grossest conflict of interest that encouraging someone, or telling someone to assert his legal right

in a court of law constitutes a pattern of racketeering activity. And that is my ruling, and that is the basis upon which the first count is dismissed.

*Id.* at 29–30. The bankruptcy court and appellants agreed that the first and second RICO counts were identical, and accordingly the bankruptcy court dismissed the second count. *Id.* at 31–32.

■ Appellants' arguments on appeal with respect to the RICO counts are first, the post-settlement alleged conduct of Alpert constitutes a pattern of racketeering activity, and second, even if the post-settlement alleged conduct of Alpert does not constitute a pattern of racketeering activity, the pre-settlement conduct of J.H. Cohn and the defendant employees does constitute such a pattern. Appellants' first argument is without merit. The transcript shows that the bankruptcy judge made his decision assuming that Alpert had breached a fiduciary duty to Bernheim. His application of the facts to the requirements set forth in *Sedima* was not clearly erroneous. His application of the facts to his determination that a pattern of racketeering activity was not shown was done in a manner entirely consistent with the case-by-case approach mandated by the Third Circuit in *Barticheck.*

This court notes that the gravamen of the post-settlement conduct centers around only one alleged perpetrator, Alpert, and only two alleged victims, Bernheim and his company, Reach. In addition, this court finds no support in the record for the assertion that Alpert committed fraud against Bernheim, since Bernheim's siblings were successful in their action against Bernheim. The elements of fraud are defined in New Jersey as a material misrepresentation of past or present fact, made by defendant with knowledge of its falsity or reckless disregard thereof, with the intention that the plaintiff rely thereon, and with the plaintiff in fact relying thereon to his or her detriment." *See, e.g., Seiler v. E.F. Hutton & Co., Inc.,* 584 F.Supp. 607, 613 (D.N.J.1984) and cases cited therein. Alpert's conversation with Tony Bernheim clearly does not satisfy that standard.

Therefore, Alpert could not, post-settlement, have commited mail or wire fraud against Bernheim, and Alpert could not have engaged in "racketeering activity" during this period. *See* 18 U.S.C. § 1961(1)(D) ("racketeering activity" means any offense involving fraud ... punishable under any law of the United States).

The bankruptcy court did not reach the pre-settlement conduct of defendants in dismissing Counts One and Two. However, as appellants note in their brief this court must find that the bankruptcy court was incorrect in its application of the entire controversy doctrine to reach the pre-settlement conduct as it relates to Counts One and Two. Accordingly, the court must review the application of the entire controversy doctrine before making any determination as to defendants' pre-settlement conduct.

## B. The Role of the Entire Controversy Doctrine in the Case

The entire controversy doctrine is embodied in N.J. Rule 4:27–1(b), which states, "Each party to an action shall assert therein all claims which he may have against any other party thereto insofar as may be required by application of the entire controversy doctrine." The leading opinion describing this doctrine is *Ajamian v. Schlanger*, 14 N.J. 483, 103 A.2d 9, *cert. denied*, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954). In *Ajamian* Justice Brennan noted the need "to avoid the delays and wasteful expense of the multiplicity of litigation which results from the splitting of a controversy." *Id.* at 485, 103 A.2d 9. Since *Ajamian* the doctrine has been interpreted to require "that a party include in the action all related claims against an adversary and its failure to do so precludes the maintenance of a second action." *Aetna Ins. Co. v. Gilchrist Brothers, Inc.*, 85 N.J. 550, 556–57, 428 A.2d 1254 (1981).

*Aetna* was decided on April 7, 1981, before the settlements took place. Critically to the instant case, the court in *Aetna* stated:

> Our research has not disclosed any case in this State where the single con-

troversy doctrine precluded a second action because of a failure to join parties. *Thatcher v. Jerry O'Mahony, Inc.*, 39 N.J.Super. 330 [121 A.2d 50] (App.Div. 1956), referred to the principle in a situation where indispensable parties had not been joined. There, plaintiff in his capacity as a stockholder sued a corporation to invalidate a stockholder's ratification of an agreement which provided for stock options. Plaintiff, if successful in that action, intended then to seek to invalidate three stock options granted to certain directors. In dismissing the action Judge Goldmann referred to the policy "against subdividing a single controversy by resort to fractional litigation," *id.* at 335 [121 A.2d 50], and suggested the entire controversy doctrine justified dismissal. However, the suit was dismissed not because there had been a prior final adjudication between the parties, but because of the absence of indispensable parties, the three directors.

> It may be that under some circumstances the failure of a party to be joined or to intervene in a prior action should, after adjudication, bar a second action against that party involving the same subject matter. Thus, if [a party] were an indispensable party, then that action should not have proceeded without it and it would not be barred from now pursuing relief. Or if [a party], though not an indispensable party but a proper or desirable one, was aware of [another party's] ongoing lawsuit, sat idly by and permitted the action to proceed to judgment without intervening, perhaps preclusion ... should be in order. However, our Rules have not required such intervention and, even if we were so inclined, it would be unfair to state a new procedural rule to preclude a party from having its day in court.

*Aetna*, 85 N.J. at 559–60, 428 A.2d 1254. The New Jersey Supreme Court's concern that a newly-established rule regarding the entire controversy doctrine would preclude a party from having its day in court was also evident in *Crispin v. Volkswagenwerk, A.G.*, 96 N.J. 336, 476 A.2d 250 (1984). In *Crispin* the court found that

"the time has come to reconsider the application of the entire controversy doctrine to parties as well as claims, in certain limited circumstances." *Id.* at 343, 476 A.2d 250. However, the court refused to make its considerations retroactive. *Id.* at 343–44, 476 A.2d 250.

In light of the New Jersey Supreme Court's concerns articulated in *Aetna* and *Crispin* the inquiry of this court on appeal must be whether the bankruptcy court properly applied the entire controversy doctrine based on precedents as of 1981.

■ The bankruptcy court, after hearing arguments from both parties, concluded that the entire controversy doctrine applied to all defendants in this matter who are implicated in matters leading up to and including the 1981 settlements. The bankruptcy court found that both of the 1981 suits had to be taken together for the purpose of applying the doctrine, Tr. of June 29, 1988 at 58; that the facts stated by Bernheim's counsel in state court in 1981 encompassed all of the relevant facts of this case, *id.* at 58–62; and that the well-settled principle that settlements are to be encouraged was persuasive in this case, *id.* at 62–64. The bankruptcy court concluded that had Bernheim's counsel stated in writing what he said orally, all of the defendants in this matter would have been necessary parties; thus, it would be "an avoidance of the consequences of a settlement" to conclude that Schlumpf, Sachs, and Rocker were not necessary parties for the purposes of the entire controversy doctrine. *Id.* at 63. The bankruptcy court also found that all of the transactions between the parties leading up to and including the 1981 settlements constituted the same "bundle of rights"—to wit, "all of the items concerning the ownership of the stock, the nondisclosure of that ownership, the rights to go forward with respect to investment, which are derivative of ownership"—which were litigated and concluded by settlement in 1981. *Id.* at 65–66.

The court concludes that the bankruptcy judge's conclusions regarding the entire controversy doctrine were correct. The court notes initially that it is unable to find

any case that is directly on point. This is important because the entire controversy doctrine is not a wooden rule, and should not be applied mechanically; a court must apply the rule in such a manner as would advance the doctrine's goals while recognizing the limitations stated in *Aetna*. Thus, the bankruptcy judge was faced with a fact pattern that was not similar to the fact pattern of any precedent.

It is clear that Bernheim knew the precise factual theory underlying this case when his then-lawyer articulated this theory as set forth *supra* in 1981. Schlumpf, Sachs, and Rocker were accountants who were intimately involved in the very issues and documents that were raised in the 1981 lawsuits. The record also shows that Sachs was present when the *Alpert and Rones* suit was settled, and participated in reaching the settlement. Further, appellants allege that the financial statements in which the alleged misrepresentations regarding Alpert's and Rones' shares were made were produced primarily by Rocker and Schlumpf. Tr. of January 21, 1988 at 44–45, 75–76. Appellants' argument that nonparties could not fall within the entire controversy doctrine as of 1981, if taken to its logical conclusion, would dictate that following the instant suit appellants could sue other persons in J.H. Cohn, one at a time, forever. Such a result would directly counter the policies stated in *Ajamian* as well as traditional principles surrounding settlement agreements.

The court recognizes the concerns stated in *Zaromb v. Borucka*, 166 N.J.Super 22, 27, 398 A.2d 1308 (App.Div.1979) ("We must determine whether Zaromb's present claim for slander is among the "bundle of rights" arising from the series of transactions litigated in the prior suits and, if so, was Zaromb aware of its existence.... [I]f a party does not know of a related claim, the entire controversy doctrine does not operate as a bar to a second suit on the unknown claim." (citations omitted)). However, it is inconceivable that Bernheim did not have knowledge of the participation of Schlumpf, Sachs, and Rocker in 1981. J.H. Cohn is not a living, breathing person—it is

an organization made up of, *inter alia,* the very persons whom Bernheim worked with for years prior to 1981 and whom he now sues. This conclusion is consistent with *Aetna* 's discussion of *Thatcher, supra,* in that the realities of the corporate entity were taken into account by the bankruptcy court in determining, as the bankruptcy court did, that the individual defendants of Reach were necessary parties for the purposes of the entire controversy doctrine.

■ This court also agrees with the bankruptcy court that the settlement of the two 1981 suits, when taken together, prevent appellants from raising issues against persons who comprise one of the parties to the settlements, namely J.H. Cohn. *Cf. Joseph L. Muscarelle, Inc. v. State,* 175 N.J.Super. 384, 395, 418 A.2d 1310 (App. Div.1980) ("It is ... settled that a consent judgment has the same *res judicata* effect as any other judgment." (citations omitted)), *app. dismissed,* 87 N.J. 321, 434 A.2d 73 (1981). The entire controversy doctrine may be raised in matters where the prior action was settled. *Muscarelle,* 175 N.J. Super. at 395–96, 418 A.2d 1310 and cases cited therein.

Appellants have argued that they are entitled to indemnification from these defendants. This court finds that the entire controversy rule precludes this argument.

Since the bankruptcy court determination as to the entire controversy doctrine was correct, the court finds that pre-settlement conduct may not be considered as to the RICO counts, and that the bankruptcy court was correct in dismissing Counts One and Two in their entirety.

*C. The Conduct of Benjamin Alpert Subsequent to the Settlement of the Superior Court Actions in 1981*

■ The remaining issues on appeal are whether Alpert's actions subsequent to the settlements of the 1981 actions constituted common law breach of fiduciary duty, common law tortious interference, professional malpractice, negligence, or otherwise actionable tortious interference. Central to appellants' contentions is the fiduciary relationship between J.H. Cohn

and both Reach and Bernheim at the time that Alpert spoke with Tony Bernheim. Appellees and the bankruptcy court noted that Tony Bernheim was a J.H. Cohn client as well, although appellants dispute this. The bankruptcy court stated:

The facts are that ... [Alpert] called [Tony Bernheim] over and I can infer, giving all inferences due to the plaintiffs' case at this point, that he called him over for the purpose of telling him what was going on. What was going on? He didn't tell him anything that wasn't true. He told him an absolutely true fact. He told him that Andy Bernheim was subscribing to these shares in his own name. He told him further, "Go check it with an independent counsel."

Now in order to establish impropriety, it does not seem to me that telling somebody a truthful fact can be used as the gravamen of a wrong....

In this case, Ben Alpert said—he didn't say Andy doesn't own the stock. He said Andy is taking it in his own name. He didn't say, "Here's a little scheme. Go enjoin Andy from doing this." He said, "Go seek independent counsel." In both cases, assuming all of the facts, assuming that that is what is proved, I find that that does not constitute a cause of action in fraud, does not constitute a cause of action in conflict of interest, and it does not constitute a cause of action in a breach of fiduciary duty to anyone.

Tr. of June 29, 1988 at 97–98.

The court finds upon its review of the record that the bankruptcy court's findings of fact regarding Alpert's statement to Tony Bernheim were not clearly erroneous. In addition, the court is satisfied that the bankruptcy court's conclusion that Alpert did not commit negligence or tortious interference is accurate; the court notes that it is unable to find in the record any evidence in support of these counts, nor are these counts referenced in appellants' briefs on appeal. Furthermore, as stated *supra* there is no evidence supporting appellants' position that Alpert's conduct satisfied the elements necessary to establish a prima facie case of fraud.

■ Finally, appellants failed to provide the bankruptcy court with enough evidence to show that Alpert committed professional malpractice against appellants. The only evidence in the record on this issue is quoted above, *see* tr. of June 29, 1988 at 26–32, 97–98. Bernheim did not testify at trial, and did not satisfy the bankruptcy court that he was unavailable or unable to appear at trial; therefore his deposition testimony was properly not allowed into evidence by the bankruptcy court. Tr. of June 29, 1988 at 1–5. Appellants did not offer expert testimony on this issue at trial. Expert testimony is necessary to establish professional malpractice when the matter is so esoteric that a jury of common experience could not form a valid judgment as to whether the conduct of the defendant was reasonable. *Butler v. Acme Markets, Inc.,* 89 N.J. 270, 283, 445 A.2d 1141 (1982). Whether Alpert or any of the defendants committed professional malpractice is an esoteric question and is certainly not a question that could be addressed by a jury without the assistance of an expert on ethical standards for accountants in New Jersey.[1]

In light of appellants' shortcomings in presenting their case on the issue of professional malpractice, appellants' position that the bankruptcy court was in error in finding that Alpert did not commit professional malpractice is without merit. The bankruptcy court made its decision based on the evidence properly before him, and this court finds that the bankruptcy court's decision was not based on factual findings that were clearly erroneous. Furthermore, there was not enough evidence to support a claim for professional malpractice.

*D. Sanctions*

Appellees argue in their brief that the court should award defendants their costs and expenses in opposing "Andy's frivolous complaint and appeal." Appellants respond in their reply brief that appellees' brief "should be suppressed because of its scurrilous and intentionally misleading

character, and as a sanction for filing in this court a spurious Rule 11 motion." The court finds that while counsel on both sides have taken their zealous representation of their clients to extremes at certain points in their briefs, sanctions are not warranted.

An order accompanies this opinion.

---

**1.** This court expresses no opinion as to the bankruptcy court's observation that there was sufficient evidence presented to establish a

claim for legal malpractice against Alpert were Alpert acting in a lawyer-client relationship with Andrew and Tony Bernheim.